IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CMS ENERGY CORPORATION; CONSUMERS ENERGY COMPANY; DTE ENERGY COMPANY; DTE ELECTRIC COMPANY; DTE GAS COMPANY; CMS ENERGY CORPORATION EMPLOYEES FOR BETTER GOVERNMENT; DTE ENERGY COMPANY POLITICAL ACTION COMMITTEE; CASE LANCASTER; and AYESHA LANCASTER,

Plaintiffs,

v.

JONATHAN BRATER, in his official capacity as the Director of the Michigan Bureau of Elections; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan, or her successor in office; and JOCELYN BENSON, in her official capacity as Secretary of State of the State of Michigan, or her successor in office,

Defendants.

Case No. 1:26-cv-_______________

Hon.

**Complaint for Declaratory and Injunctive Relief**

---

Stephen J. van Stempvoort
Andrew C. Goetz
Amanda L. Rauh-Bieri
MILLER JOHNSON
Counsel for Plaintiffs
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1700
vanstempvoorts@millerjohnson.com
goetza@millerjohnson.com
rauhbieria@millerjohnson.com

---

**Complaint for Declaratory and Injunctive Relief**

The Plaintiffs, CMS Energy Corporation, Consumers Energy Company, DTE Energy Company, DTE Electric Company, DTE Gas Company, CMS Energy Corporation Employees for Better Government ("EBG"), DTE Energy Company Political Action Committee ("DTE PAC"), Case Lancaster, and Ayesha Lancaster, file this Complaint for declaratory judgment and injunctive relief to vindicate their rights under the United States Constitution, as detailed below:

**Introduction**

1. Section 30a of the Michigan Campaign Finance Act ("MCFA"), enacted by Michigan voters on November 3, 2026, blocks Michigan's utilities—along with many individuals and entities even loosely associated with them—from participating in Michigan's political process through campaign contributions.

2. To do so, Section 30a imposes an absolute ban on any contribution, "directly or indirectly," by a gas or electric utility, any "principal" of a utility, or any entity "affiliated with" a utility, to most candidates for state office and a sprawling category of entities "affiliated with" those candidates. Mich. Comp. Laws § 169.230a(1).

3. The coalition behind Section 30a, Michiganders for Money Out of Politics ("MMOP"), has long opposed utilities' policy positions, and it conceived and promoted the MMOP ballot question initiative (the "MMOP Initiative") as a means of excluding Plaintiffs from critical aspects of the political debate.

4. The First Amendment forbids the government from silencing disfavored speakers or viewpoints in this fashion. The First Amendment protects "the widest

possible dissemination of information from diverse and antagonistic sources" and assures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976). This is First Amendment 101.

5. DTE and Consumers have deep roots in Michigan. They employ many Michiganders, invest billions of dollars in Michigan's energy infrastructure, and bring practical, on-the-ground experience to public debates about reliability, affordability, clean energy, and economic growth. Policymakers and voters benefit from hearing that perspective, even if they may sometimes disagree with it.

6. The First Amendment does not permit one side of a policy dispute to legislate the other side out of the debate. Restrictions that single out disfavored speakers or viewpoints are "blatant" violations of the First Amendment, *Chiles v. Salazar*, 607 U.S. 627, 641 (2026), and the government may not "restrict the political participation of some in order to enhance the relative influence of others," *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 191 (2014). Because Section 30a constitutes speaker-based viewpoint discrimination, it is unconstitutional on that basis alone.

7. Even if treated as a content-neutral measure, Section 30a fails the "closely drawn" scrutiny that governs restrictions on campaign contributions. The only permissible governmental interest in this context is preventing quid pro quo corruption or its appearance. *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 609 U.S. 908, 922–23 (2026) ("*NRSC*"). There is no evidence of such

corruption by Michigan's utilities—no scandal, no exchange of official acts for money, no examples whatsoever. Section 30a's sponsors offered only slogans and generic references to "pay-to-play politics," "big money," and "corporate influence." Vague and speculative concerns of that kind cannot justify speech restrictions of the kind contained in Section 30a.

8. Nor is Section 30a closely drawn to anything. It sweeps in people with no connection to any utility-related decisions; eliminates the PAC and separate-segregated-fund channels that the Supreme Court has treated as essential; ignores the contribution limits, disclosure rules, anti-conduit rules, and state ethics rules already in place; and goes well beyond the laws of any other State.

9. Section 30a takes effect within only a few weeks. Absent an injunction, Plaintiffs will be forced to choose between surrendering their rights to political association and risking substantial penalties for exercising them. That is irreparable harm, and the public gains nothing from the enforcement of an unconstitutional speech restriction.

10. Plaintiffs therefore ask the Court to declare that Section 30a violates the First and Fourteenth Amendments, both facially and as applied, and to enjoin its enforcement.

## Parties

### The Utility Plaintiffs

11. Plaintiff CMS Energy Corporation is a Michigan corporation and the parent company of Consumers Energy Company. CMS Energy Corporation is a

"principal" of a utility and "affiliated with" an electric or gas utility under Mich. Comp. Laws § 169.230a(2) and (5)(d).

12. Plaintiff Consumers Energy Company is the principal subsidiary of CMS Energy Corporation. It is a utility providing electricity and/or natural gas to millions of customers in every county of Michigan's Lower Peninsula. Consumers Energy Company is regulated by the Michigan Public Service Commission ("MPSC") and is an "electric utility" and a "gas utility" under Mich. Comp. Laws § 169.230a(5)(a).

13. Plaintiff DTE Energy Company is a Michigan corporation and the parent of DTE Electric Company and DTE Gas Company. DTE Energy Company is a "principal" of a utility and "affiliated with" an electric or gas utility under Mich. Comp. Laws § 169.230a(2) and (5)(d).

14. Plaintiff DTE Electric Company and Plaintiff DTE Gas Company are utilities and subsidiaries of DTE Energy Company. DTE Electric Company provides electric service to over 2.2 million customers in southeast Michigan, and DTE Gas Company provides natural gas service to approximately 1.3 million customers across Michigan. DTE Electric Company and DTE Gas Company are regulated by the MPSC and are, respectively, an "electric utility" and a "gas utility" under Mich. Comp. Laws § 169.230a(5)(a).

15. CMS Energy Corporation, Consumers Energy Company, DTE Energy Company, DTE Electric Company, and DTE Gas Company are together "the Utility Plaintiffs."

**The Employee PAC Plaintiffs**

16. Plaintiff EBG is the state political action committee of CMS Energy Corporation and its affiliates, including Consumers Energy. EBG is a separate segregated fund ("SSF") under the MCFA*, see* Mich. Comp. Laws § 169.255. EBG is funded entirely by voluntary contributions from eligible employees and shareholders.

17. Plaintiff DTE PAC is the state political action committee of DTE Energy Company and its affiliates, including DTE Electric Company and DTE Gas Company. DTE PAC is a voluntary, non-partisan committee of DTE employees and a separate segregated fund under Mich. Comp. Laws § 169.255. DTE PAC is funded entirely by voluntary contributions from eligible employees. DTE PAC's members elect a steering committee that considers criteria such as the candidate's integrity, leadership, district, and positions on issues important to the company.

18. EBG and DTE PAC are together "the PAC Plaintiffs."

**The Individual Plaintiffs**

19. Plaintiff Case Lancaster is the Treasurer of DTE Energy Company, DTE Electric Company, and DTE Gas Company. As a utility treasurer, Mr. Lancaster is a "principal" of a utility under Mich. Comp. Laws § 169.230a(5)(d)(ii). Mr. Lancaster resides in Bloomfield Hills, Michigan.

20. Plaintiff Ayesha Lancaster is the 86-year-old mother of Case Lancaster. Because Section 30a extends to the "immediate family" of utility officers, Ms. Lancaster is a "principal" of a utility under Mich. Comp. Laws § 169.230a(5)(d)(iv),

even though she has no role at any utility. Ms. Lancaster resides in Brighton, Michigan.

21. Mr. Lancaster and Ms. Lancaster are together "the Individual Plaintiffs."

**The Defendants**

22. Defendant Jonathan Brater is the Director of the Michigan Bureau of Elections and is named in his official capacity. The Director of the Michigan Bureau of Elections is "vested with the powers and shall perform the duties of the secretary of state under his or her supervision, with respect to the supervision and administration of election laws," *see* Mich. Comp. Laws § 168.32(1); see also Mich. Admin. Code R. 169.2(1). Complaints alleging a violation of the Michigan Campaign Finance Act are filed with and investigated by the Michigan Bureau of Elections.[1]

23. Defendant Jocelyn Benson is Michigan's Secretary of State and is named in her official capacity. The Secretary of State is Michigan's chief elections officer, *see* Mich. Comp. Laws § 169.215, and must "investigate alleged violations" of Section 30a. Mich. Comp. Laws § 169.230a(4); *see also* Mich. Comp. Laws § 169.215(9), (15).

24. Defendant Dana Nessel is the Attorney General of the State of Michigan and is named in her official capacity. Section 30a provides that "if the offending electric or gas utility refuses to pay its civil fine, then the attorney general may bring

[1] Michigan Department of State, "Complaints," https://www.michigan.gov/sos/elections/disclosure/cfr/complaints (last accessed on Nov. 5, 2026).

an action to collect the fine." Mich. Comp. Laws § 169.230a(4); *see also* Mich. Comp. Laws § 169.215(9), (15).

**Jurisdiction and Venue**

25. This action arises under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. This Court therefore has subject-matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3).

26. This Court has authority to grant injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65 and declaratory relief under 28 U.S.C. §§ 2201 and 2202.

27. Plaintiffs seek relief against the Secretary of State and the Attorney General in their official capacities. *See Ex parte Young*, 209 U.S. 123 (1908).

28. This Court may award costs and reasonable attorneys' fees under 42 U.S.C. § 1988(b).

29. Venue is proper because the official offices of the Secretary of State and the Attorney General are in Ingham County, which is in the Western District of Michigan. 28 U.S.C. § 1391(b). In addition, a substantial part of the events or omissions that give rise to Plaintiffs' claims occurred or will occur in the Western District of Michigan, and Section 30a of the MCFA restricts Plaintiffs' activities in this District.

**General Allegations**

**I. The Michigan Campaign Finance Act**

30. The MCFA, Mich. Comp. Laws § 169.201 *et seq.*, regulates political contributions and expenditures in Michigan.

31. Generally speaking, the MCFA prohibits corporations, including corporations like the Utility Plaintiffs, from using funds from their corporate treasuries to make contributions to candidate committees, political party committees, and political committees. Mich. Comp. Laws § 169.254(1).

32. Mich. Comp. Laws § 169.255 permits corporations like Utility Plaintiffs to establish and administer a separate segregated fund to solicit voluntary contributions from their stockholders and certain eligible employees.

33. The MCFA has long imposed contribution limits, Mich. Comp. Laws § 169.252, as well as comprehensive disclosure and reporting requirements, Mich. Comp. Laws § 169.226 *et seq*.

34. The MCFA's longstanding provisions also contain anti-conduit and attribution provisions that prohibit contributions in the name of another and attribute controlled or directed contributions to their true source. *See* Mich. Comp. Laws §§ 169.231, 169.241, 169.244(1), 169.270, 169.271.

## II. The MMOP Initiative targets Plaintiffs' political speech without any evidence or history of quid pro quo corruption.

35. MMOP is a ballot question committee formed by a coalition of advocacy organizations.[2] These organizations have regularly opposed Michigan's utilities, including the Utility Plaintiffs, on policy issues.

36. For example, Clean Water Action, one of MMOP's coalition partners, advocates replacing DTE with a municipal utility in Ann Arbor, asserting that "[t]he

[2] *Who is Behind the Fight?*, https://mopupmichigan.org/learn/about/ (last accessed on Nov. 5, 2026).

services DTE provides, and the values and priorities of DTE and their shareholders, do not align with those of the Ann Arbor community."[3]

37. Rather than continuing to answer the utilities' speech with "more speech"—the First Amendment's "governing rule," *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 361 (2010)—those same advocacy organizations have invested in state-sanctioned restrictions on their political opponents' rights to expression and association.

38. The advocacy organizations' primary means of doing so was to sponsor and advocate for the adoption of the MMOP Initiative (Proposal 2) at the November 2026 election. In relevant part, the Initiative proposed to amend the MCFA by adding Section 30a, which bans political contributions by utilities and people or entities aligned with utilities.

39. The Initiative's sponsors told voters that the Initiative was aimed at the Utility Plaintiffs because of policy disagreements over rates, reliability, profits, and energy policy.

40. For example, MMOP's website asked how the utilities "get away with" supposed problems regarding rates and reliability. Its answer: "Political contributions."[4]

---

[3] Clean Water Action, The Case for Public Power in Ann Arbor, https://cleanwater.org/case-public-power-ann-arbor (last accessed on Nov. 5, 2026).
[4] *What's the Problem?*, https://mopupmichigan.org/learn/problem/#pay-to-play (last accessed on Nov. 5, 2026).

41. To justify Section 30a's sweeping ban, the MMOP Initiative's sponsors relied only on generalized assertions about "pay-to-play politics," "big money," "special interests," "corporate influence," and "corporate capture."[5]

42. Although the MMOP Initiative's sponsors presented plenty of charged rhetoric, they pointed to no evidence that Plaintiffs have participated in any actual quid pro quo corruption. There is no such evidence.

43. Despite extensive public criticism of the Utility Plaintiffs by MMOP and its supporters, Plaintiffs are aware of no allegations—much less substantiated accounts—of bribery, kickbacks, payments to public officials, or any other exchange of contributions or benefits for official action involving Plaintiffs or their principals.

44. MMOP's criticisms instead focused on the utilities' lawful participation in the political process, their advocacy on legislation and regulation, and their perceived influence.

45. Not only does Section 30a target speech without any evidence of corruption, but it is openly one-sided.

46. Section 30a prohibits political contributions to most state elected officials and their related entities by utilities, their employees' PACs, their principals,

[5] *What's the Problem?*, https://mopupmichigan.org/learn/problem/#pay-to-play (last accessed on Nov. 5, 2026); *Who is Michiganders for Money Out of Politics?*, https://mopupmichigan.org/learn/about/#faqs (last accessed on Nov. 5, 2026); *What is this Problem?*, https://mopupmichigan.org/learn/about/#faqs (last accessed on Nov. 5, 2026); *Where did MMOP Begin?*, https://mopupmichigan.org/learn/about/ (last accessed on Nov. 5, 2026); *Ballot Proposal Would Ban Political Spending from DTE, Consumers Energy*, Voters Not Politicians (Jun. 30, 2026), https://votersnotpoliticians.com/ballot-proposal-would-ban-political-spending-from-dte-consumers-energy/.

the families of their principals, and the organizations that the utilities support. But the organizations and individuals that sponsored and promoted the Initiative in opposition to the utilities remain free themselves to contribute to the same individuals and entities that Section 30a prohibits the utilities from supporting. By promoting the Initiative, in other words, the MMOP Initiative's sponsors were attempting to cripple their political opponents' ability to participate in a critical aspect of the political process while leaving themselves free rein to continue engaging in the very same arena that they boxed the utilities out of.

47. MMOP has also acknowledged that it crafted the Initiative to target a very particular class of speakers, preserving the free-speech rights of some organizations while assailing those of others. MMOP's website explains, for example, that the Initiative "explicitly excludes collective bargaining agreements" and that "[u]nions and individual union members will not be impacted by the policy changes in the petition." Indeed, the website indicates that MMOP "ha[s] been working closely with Labor to make sure they understand that they will not be impacted."[6]

**III. Section 30a's provisions target Plaintiffs' political speech.**

48. The MMOP Initiative (Proposal 2) amended Sections 1, 3, 5, 6, 9, 44, 47, and 51 of the MCFA, added Section 30a, which bans political contributions by utilities, and added Section 30b, which restricts certain contributions by government contractors.

[6] *Michigan Proposal 2 2026 Explained*, https://mopupmichigan.org/learn/michiganproposal2 (last accessed on Nov. 5, 2026).

49. Section 30a(1) provides that "[a]n electric utility, gas utility, principal of an electric utility or gas utility, or entity that is affiliated with an electric utility or gas utility shall not make a contribution or donation directly or indirectly to any of the following:

> (a) The governor, attorney general, state senator, state representative, or a candidate for such office.
>
> (b) A state or local party committee.
>
> (c) A committee, other than an independent expenditure committee or ballot question committee, that makes contributions to a candidate for office under paragraph (a).
>
> (d) A member of the Michigan public service commission.
>
> (e) An entity that is affiliated with the governor, attorney general, state senator, state representative, a candidate for such offices, or member of the Michigan public service commission and does at least one of the following:
>
>> (i) Spends more than $500 in the aggregate in an election cycle to make contributions to the person affiliated with the entity, make expenditures in support of the person affiliated with the entity or opposing the person's opponent, or make electioneering communications referencing the person affiliated with the entity or the person's opponent.

(ii) Pays for or reimburses expenses, such as travel, meals, or conference fees, of the person affiliated with the entity."

50. Section 30a(2) provides that an entity is "affiliated with" a utility "if the entity is directly or indirectly established, financed, maintained, or controlled by the electric utility, gas utility, or principal of an electric utility or gas utility." Mich. Comp. Laws § 169.230a(2).

51. Section 30a(2) does not define or limit what it means for an entity "affiliated with" a utility to be "directly or indirectly" "financed" by the utility or principal.

52. Section 30a(3) provides that an entity is affiliated with a covered official under Section 30a(1)(e) "if the governor, attorney general, state senator, state representative, a candidate for such office, member of the Michigan public service commission, or the agents, immediate family, or staff members of such persons does at least one of the following:

(a) Directly or indirectly established, finances, maintains, or controls the entity.

(b) Has solicited funds for the entity within the prior two years, unless the entity is an organization exempt from federal income tax under section 501(C)(3) of the internal revenue code, 26 USC 501, or any successor statute.

(c) Serves in an executive or managerial capacity for the entity . . . ."

53. Section 30a(5)(d) defines "principal of an electric utility or gas utility" to "include[]":

> (i) An individual who is a member of the board of directors, a majority owner, or substantial owner of the electric utility or gas utility.
>
> (ii) An individual who is employed by the electric utility or gas utility as a president, chief executive officer, treasurer, or officer who holds similar responsibilities with respect to the electric utility or gas utility.
>
> (iii) An agent of the electric utility, gas utility, or principal of the electric utility or gas utility, including their lobbyist or lobbyist agent, as defined in section 5 of the lobby act, 1978 act 472, MCL 4.415.
>
> (iv) Immediate family of any person in paragraphs (i) or (ii).

54. A utility that violates Section 30a is subject "to a civil fine of not more than 10 times the amount of the contribution or donation." The Secretary of State investigates alleged violations, and the Attorney General may sue to collect the fine. Mich. Comp. Laws § 169.230a(4).

55. Under Mich. Comp. Laws § 169.215(15), "a person who violates a provision of this act [the MCFA] is subject to a civil fine of not more than $1,000.00 for each violation."

56. Section 30a contains no knowledge or intent requirement, no safe harbor for returned contributions, no opportunity to cure, and no temporal limitation.

57. The MMOP Initiative also broadens related definitions. “Electioneering communication” now includes any public communication that “[r]eferences a clearly identifiable candidate, regardless of whether the communication contains express advocacy, within 100 days before a general election or within 30 days before a primary or special election.” Mich. Comp. Laws § 169.205(4).

58. Mich. Comp. Laws § 169.206(1)(b) expands “expenditure” to include any public communication that “[p]romotes, supports, attacks, or opposes a candidate, regardless of whether the communication expressly advocates the election or defeat of a candidate.”

**IV. Michigan voters approve the MMOP Initiative.**

59. On November 3, 2026, a majority of Michigan voters approved Proposal 2, which enacted the MMOP Initiative.

60. Under Article II, Section 9 of the Michigan Constitution, an initiated law approved by the voters takes effect 10 days after the date of the official declaration of the vote.

61. Upon information and belief, the official declaration of the vote will occur on November 23, 2026, such that Section 30a will take effect on or about December 3, 2026.

62. Even though every state has publicly regulated utilities, no other state imposes a restriction comparable to Section 30a. Nor does the federal government.

63. Only three states appear to impose any utility-specific restriction on campaign contributions, and each is limited to races for an elected utility commission. *See* Ala. Code § 17-5-14(c); Ga. Code Ann. §§ 21-5-30(f), 21-5-30.1; Miss. Code Ann. § 77-1-11.

64. No state with an appointed commission, like Michigan's, singles out utilities with a ban like Section 30a.

## V. Section 30a prevents Plaintiffs from making many types of political contributions.

### A. The Utility Plaintiffs

65. Section 30a directly regulates each Utility Plaintiff and subjects it to civil fines of up to 10 times the amount of any prohibited contribution or donation. Mich. Comp. Laws § 169.230a(4).

66. Section 30a(1)(e) prohibits the Utility Plaintiffs from contributing, "directly or indirectly," to any entity that is "affiliated" with a covered official and spends more than $500 in an election cycle on contributions, expenditures, or electioneering communications referencing that official.

67. The Utility Plaintiffs currently make contributions and donations that Section 30a(1)(e) now prohibits, and the Utility Plaintiffs intend to continue making such contributions and donations unless Section 30a goes into effect.

68. In recent years, for example, the Utility Plaintiffs contributed to multiple 501(c)(4) organizations.[7] DTE Energy Company has contributed to Business Leaders of Michigan, Michigan Alliance for Business, and Michigan Townships

[7] *See* 26 U.S.C. § 501(c)(4).

Association, among others.[8] CMS Energy Corporation has likewise contributed to several 501(c)(4) organizations within the last several years, including Congressional Institute, Inc., Governing Majority Education Fund, Michigan Strong, Preserve Michigan's Future Fund, Road to Michigan's Future, and Great Lakes Job Alliance.

69. Since September 1, 2025, DTE Energy has also contributed to 527 organizations[9], including the Michigan Republican Party, the Michigan Democratic State Central – 21st Century Fund, and the Michigan Chamber PAC. CMS Energy Corporation likewise contributed to 527 organizations during the relevant time period, including the 21st Century Fund and the Democratic Governors Association.

70. On information and belief, several of those 501(c)(4) and 527 organizations are "affiliated" with covered officials within the meaning of Mich. Comp. Laws § 169.230a(3) and have made and will continue to make expenditures or electioneering communications that reference covered officials, within the meaning of Mich. Comp. Laws § 169.230a(1)(e).

71. Even if some of the 501(c)(4) and 527 organizations to which the Utility Plaintiffs seek to make future contributions are not currently "affiliated" with covered officials, it is not feasible for the Utility Plaintiffs to determine whether—for example—an "agent" of a covered official has "indirectly" financed an entity or has

---

[8] https://www.dteenergy.com/content/dam/dteenergy/deg/website/common/about-us/company-information/corporate-governance/political-participation/DTECorporatePoliticalContributions.pdf (last accessed on Nov. 5, 2026).

[9] *See* 26 U.S.C. § 527.

solicited funds for the entity within the prior two years, thereby making that entity "affiliated with" the official. *See* Mich. Comp. Laws § 169.230a(3).

72. Section 30a therefore has the practical effect of potentially imposing retroactive liability on the Utility Plaintiffs if the Utility Plaintiffs contribute to an entity and that entity later makes a contribution that Section 30a prohibits.

73. Due to the Utility Plaintiffs' practical inability to determine with certainty that any particular 501(c)(4) or 527 organization is not "affiliated" with a covered individual, Mich. Comp. Laws § 169.230a(1)(e)—combined with the 10-fold penalty contained in Mich. Comp. Laws § 169.230a(4), for which there is no safe harbor and no cure—chills the Utility Plaintiffs from making any contributions to any such organization, even when they would otherwise be permissible.

74. The Utility Plaintiffs also regularly contribute to ballot question committees, as Mich. Comp. Laws § 169.254(3) and federal law permit. Within the last several years, for example, CMS Energy has contributed to Fair and Equal Michigan, Voters for Transparency and Term Limits, Michigan Chamber PAC II, and Protect MI Free Speech. Likewise, DTE Energy has contributed to Fair and Equal Michigan, Voters for Transparency and Term Limits, Partners for Transit, and Ann Arbor Responsible Energy Coalition.

75. On information and belief, it is possible that some ballot question committees to which the Utility Plaintiffs may seek to contribute will be "affiliated with" a covered official or candidate within the meaning of Mich. Comp. Laws § 169.230a(3) and will make electioneering communications referencing a candidate

within the meaning of Mich. Comp. Laws § 169.230a(1)(e)(i), such that the Utility Plaintiffs would be prohibited from contributing to them.

76. For example, under Section 30a, the Utility Plaintiffs would be prohibited from contributing to a ballot question committee like Protect MI Free Speech that advocated against Section 30a's inclusion on the ballot if a former staff member of a state legislator had solicited funds for the committee within the previous two years and the committee made any public communication merely "referencing" the state legislator. Mich. Comp. Laws § 169.230a(1)(e)(i), (3), & (5)(e).

77. Moreover, as Mich. Comp. Laws § 169.255 permits, each Utility Plaintiff establishes its respective PAC and pays certain costs of administering it and soliciting contributions, including payroll-deduction systems, solicitation communications, and compliance services.

78. Each Utility Plaintiff also has many individuals who are "principals" under Section 30a, including directors, substantial owners, senior officers, and their immediate family members. *See* Mich. Comp. Laws § 169.230a(5)(d). Section 30a does not define "immediate family."

79. Section 30a's definition of "principal of an electric utility or gas utility" also reaches "agents." Section 30a does not define "agent," but under Michigan law, an agent is anyone "having express or implied authority to represent or act on [the principal's] behalf." *Stephenson v. Golden*, 279 Mich. 710, 734 (1937). Section 30a's prohibitions could therefore reach each Utility Plaintiff's in-house and outside

counsel, accountants, insurance brokers, government-affairs consultants, contractors, and employees acting in an agency capacity.

80. On information and belief, the Utility Plaintiffs' directors, senior officers, agents, and their immediate family members have historically made personal contributions to covered candidates and committees, and many intend to do so in the upcoming election cycle.

81. Because each Utility Plaintiff establishes and maintains its respective employee PAC, Section 30a(2) bars the PACs as "affiliated" entities from making the contributions that Mich. Comp. Laws § 169.255 expressly authorizes and exposes the Utility Plaintiffs to liability for the PACs' contributions. Section 30a thus interferes with the Utility Plaintiffs' administration of their separate segregated funds—a function that Mich. Comp. Laws § 169.255 and federal law expressly recognize.

82. Each Utility Plaintiff faces potential civil fines of up to 10 times the value of its affected contributions. Because Section 30a has no knowledge requirement, safe harbor, or return provision, a contribution that is lawful when made can become unlawful later if the recipient becomes "affiliated" with a covered official or makes an "electioneering communication." That strict-liability exposure for routine civic and policy support will chill the Utility Plaintiffs' participation in political debate.

83. With Section 30a's passage, the Utility Plaintiffs will be compelled to forgo political contributions they would otherwise make.

**B. The PAC Plaintiffs**

84. EBG is registered as an independent committee under Mich. Comp. Laws § 169.208. It is a separate segregated fund under Mich. Comp. Laws § 169.255, established by CMS Energy's predecessor-in-interest in 1977.

85. EBG is "a voluntary nonprofit association composed of its Members" that is "independent of any political party, political committee, candidate, or organization." EBG membership is voluntary and open to an eligible class of several thousand employees and shareholders of CMS Energy Corporation, including Consumers Energy Company. EBG is governed by an elected, voluntary steering committee of non-executive employees, which approves contributions either through a pre-approved budget or by direct vote. EBG currently has several hundred members.

86. EBG's purposes include ensuring "that the collective voice of the membership will be heard" and supporting candidates who share its members' views. EBG exists so that Consumers Energy employees who live and work in communities across Michigan can join together, voluntarily and with their own money, to support candidates who share their views on issues affecting their jobs, their industry, and their neighbors.

87. Many of EBG's members fund EBG through voluntary automatic payroll deductions each pay period, *see* Mich. Comp. Laws § 169.255(6). The average contribution is $18.80 per member per pay period—approximately $451.20 per year. EBG's receipts, which are publicly reported and deposited in a separate segregated

fund, consist entirely of voluntary contributions from exempt employees and, occasionally, shareholders; no corporate treasury funds are used for EBG's contributions.

88. DTE PAC is registered as an independent committee under Mich. Comp. Laws § 169.208, and it is a separate segregated fund under Mich. Comp. Laws § 169.255. DTE Energy's predecessor-in-interest established DTE PAC in 1977. DTE PAC exists as a voluntary, non-profit association. Its membership is open to several thousand eligible DTE Energy employees and shareholders, including employees of DTE Electric and DTE Gas. DTE PAC is governed by a voluntary, elected steering committee comprising members of DTE PAC. DTE PAC's steering committee reviews its contributions on a case-by-case basis. DTE PAC currently has over 700 members.

89. Many of DTE PAC's members fund DTE PAC through voluntary automatic deductions each pay period, *see* Mich. Comp. Laws § 169.255(6). The average contribution is $29.28 per member per pay period—approximately $790.56 per year. DTE PAC's receipts, which are publicly reported and deposited in a separate segregated fund, consist entirely of voluntary contributions from exempt employees and, occasionally, shareholders; no corporate treasury funds are used for DTE PAC's contributions.

90. The PAC Plaintiffs contribute to candidates of both major parties and to legislative leaders and caucus committees. Although both PACs consider whether a candidate represents a district that includes a company facility, service area, or

concentration of employees, that is only one of several factors, and the PACs also contribute to candidates in districts outside the contributing utility's service territory.

91. In 2025, EBG contributed to, among many others, Michigan Senate Democratic Fund, House Republican Campaign Committee, CTE Winnie Brinks for State Senate, and Building Bridges PAC.

92. In 2025, DTE PAC contributed to, among many others, the Michigan Senate Democratic Fund, the Senate Republican Campaign Committee, Build MI PAC, Elevate Michigan, and Enduring Majority Fund.

93. Section 30a forecloses the PAC Plaintiffs' collective voice with respect to contributing to the Governor, the Attorney General, state legislators, candidates for those offices, state and local party committees, and committees that contribute to such candidates.

94. Because EBG contributes only to state candidates and committees, approximately 100% of its contributions are of the type Section 30a prohibits.

95. Over 90% of DTE PAC's contributions are to state candidates and committees (with a small portion to local candidates).[10]

96. Every year since at least 2021, DTE PAC has made multiple contributions during November and December.[11] During the last five years, EBG has also made multiple contributions in November and December.

[10] https://www.dteenergy.com/content/dam/dteenergy/deg/website/common/about-us/company-information/corporate-governance/political-participation/DTEMichiganPACContributions.pdf (last accessed on Nov. 5, 2026).
[11] *Id.*

97. But for Section 30a, each PAC Plaintiff likely would make contributions to covered candidates and committees before the end of 2026 and in the 2027–2028 election cycle. EBG makes contributions on a rolling basis, reviews contribution opportunities weekly, and, as it has done in the past, likely would make contributions before the end of 2026. DTE PAC does the same.

98. Absent relief, Section 30a will bar those contributions immediately upon its effective date.

99. Section 30a will also reduce each PAC Plaintiff's fundraising capacity. Some PAC contributors—including directors, shareholders, and family members of directors or officers—are "principals" barred from contributing "directly or indirectly" to covered recipients, and contributions through the PACs may be treated as indirect contributions. Mich. Comp. Laws § 169.230a(5)(d).

100. Section 30a thus limits the PACs' ability to represent their members' expressive interests by contributing on their behalf, deprives the PACs of lawful donors, chills contributors' associational choices, and impairs the PACs' ability to solicit and accept contributions.

101. With Section 30a's passage, the PAC Plaintiffs will be prevented from making political contributions they would otherwise make.

### C. The Individual Plaintiffs

102. Each Individual Plaintiff is a "principal" of a utility and is therefore barred from making any contribution, "directly or indirectly," from personal funds to the Governor, the Attorney General, state legislators, candidates for those offices,

state and local party committees, committees that contribute to such candidates, Michigan Public Service Commission ("MPSC") members, and entities "affiliated with" those officials. Mich. Comp. Laws § 169.230a(1), (5)(d).

103. Ms. Lancaster has routinely contributed to political candidates and campaigns, including to candidates who are now covered by Section 30a. But for Section 30a, she would continue making such contributions in the future, including to covered candidates.

104. Mr. Lancaster has personally contributed to a covered candidate, including in September 2026. Mr. Lancaster has also personally contributed to DTE PAC. But for Section 30a, he would continue making such contributions in the future, including to covered candidates.

105. All of the Individual Plaintiffs wish to preserve their ability to express support for their preferred candidates and policy positions with campaign contributions.

106. None of the Individual Plaintiffs have made political contributions using a Utility Plaintiff's funds or at a Utility Plaintiff's direction. Section 30a bars Ms. Lancaster, an 86-year-old parent, from supporting candidates of her choice solely because her son works for a utility. Section 30a bars Mr. Lancaster from making personal contributions with his own funds simply because he is employed by a utility.

107. Because a principal's violation of Section 30a exposes that individual to civil liability under the MCFA, *see* Mich. Comp. Laws § 169.215(15), Section 30a chills the speech of the Individual Plaintiffs.

## VI. Section 30a threatens imminent harm to Plaintiffs' free speech rights.

108. Section 30a will take effect 10 days after the official declaration of the vote, Mich. Const. art. II, § 9, so Plaintiffs face an imminent and credible threat of enforcement.

109. The loss of First Amendment freedoms, even for a short period of time, constitutes irreparable injury. Plaintiffs have no adequate remedy at law.

## Count I

## Viewpoint and Speaker-Based Discrimination in Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)

110. Plaintiffs incorporate the foregoing allegations.

111. Section 30a was drafted, promoted, and enacted for the purpose of excluding Plaintiffs—and their employees, agents, and family members—from the political process.

112. By choking off Plaintiffs' perspective in public debate and enhancing the relative influence of speakers who disagree with them, Section 30a is an unconstitutional, content-based restriction on political speech.

113. Section 30a singles out one class of speakers—electric and gas utilities, the employees, directors, and family members associated with them, and the organizations they support—for a total ban on political contributions, while leaving all other speakers, including the Initiative's sponsors and others who oppose the utilities' positions, free to contribute.

114. The MMOP Initiative's sponsors expressly drafted and promoted Section 30a to exclude Plaintiffs from participating in the political process.

115. The MMOP Initiative's sponsors disagreed with Plaintiffs' views on energy, environmental, and regulatory policy and sought to diminish Plaintiffs' ability to support candidates while deliberately sparing allied speakers such as labor unions.

116. Because Section 30a's restrictions are content-based and speaker-based, strict scrutiny applies. *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 166 (2015); *see Riddle v. Hickenlooper*, 742 F.3d 922, 931–32 (10th Cir. 2014) (Gorsuch, J., concurring).

117. Section 30a cannot satisfy strict scrutiny. It serves no compelling interest, because there is no evidence of quid pro quo corruption—let alone corruption that would justify a ban of Section 30a's breadth. And it is not narrowly tailored, because it is simultaneously overinclusive (reaching family members, agents, investors, and independent entities) and underinclusive (sparing other regulated industries and allied speakers such as labor unions).

118. Because the law is "content based and, in practice, viewpoint discriminatory," that conclusion is "all but dispositive." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011).

119. Absent injunctive relief, Section 30a chills Plaintiffs' political speech in violation of the First Amendment, as incorporated against the states by the Fourteenth Amendment.

120. The Plaintiffs are entitled to a declaration that Section 30a violates the First Amendment on its face and as applied to Plaintiffs, as well as preliminary and

permanent injunctive relief prohibiting the Defendants from enforcing Section 30a against them.

## Count II

### Unconstitutional Restriction on Contributions in Violation of the First and Fourteenth Amendments (42 U.S.C. § 1983)

121. Plaintiffs incorporate the foregoing allegations.

122. Even under the closely drawn scrutiny that governs generally applicable contribution restrictions, Section 30a violates the First Amendment because it is not directed toward preventing quid pro quo corruption or its appearance and is not closely drawn to that interest. *See NRSC*, 609 U.S. at 920–23.

123. Neither the Initiative's sponsors nor the materials presented to voters identified any instance of quid pro quo corruption involving Michigan utilities—no scandal, no "direct exchange of an official act for money." *NRSC*, 609 U.S. at 922–23.

124. Lacking any evidence of quid pro quo corruption, the MMOP Initiative offered only slogans and generic references to "corruption," "legalized corruption," "pay-to-play politics," "big money," "special interests," and "corporate influence." Those buzzwords are no substitute for evidence; the government "must do more than merely recite a general interest in preventing corruption." *Lavin v. Husted*, 689 F.3d 543, 547 (6th Cir. 2012).

125. No other state, and not the federal government, views the speculative risk of quid pro quo corruption as sufficient to justify a comparable restriction on utilities, and no state with an appointed commission imposes any such ban. Because the Supreme Court "has often looked to the experience of the states," that absence "is

a strong sign that the concern is too speculative to support such a restriction." *NRSC*, 609 U.S. at 929; *see Deon v. Barasch*, 960 F.3d 152, 163 (3d Cir. 2020).

126. Because Section 30a is not pursuing a constitutionally "legitimate objective," it fails at the outset. *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305 (2022).

127. Even if Section 30a were enacted to pursue a legitimate government objective, it is not closely drawn.

128. Section 30a is unconstitutionally overbroad and insufficiently tailored in at least the following respects:

a. It eliminates the employee PAC option that Mich. Comp. Laws § 169.255 authorizes. *See* Mich. Comp. Laws § 169.230a(2). The Supreme Court has upheld restrictions on direct corporate contributions only where the corporation may still participate through a PAC or separate segregated fund, which "allows corporate political participation without the temptation to use corporate funds for political influence." *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 162–63 (2003) (cleaned up); *see Buckley*, 424 U.S. at 28–29 & n.31.

b. Section 30a(2) broadly treats as "affiliated" any entity "directly or indirectly" "established, financed, maintained, or controlled" by a utility or any of its principals—including a principal's immediate family member—regardless of the degree of utility influence, thereby

sweeping in companies and organizations that have nothing to do with utilities. Mich. Comp. Laws § 169.230a(2).

c. Section 30a(2) does not define or limit in any way what it means to be "affiliated" with a utility through "indirect[]" "financ[ing]." *Id.*

d. Section 30a(5)(d) and (f) ban contributions by directors, 5% owners (potentially including institutional investors and index funds), officers, all "agents" (including counsel, accountants, insurance brokers, and consultants), and immediate family members—including adults, like Ms. Lancaster, with no involvement in utility affairs—from their personal funds.

e. Section 30a thus adopts a guilt-by-association regime based on status rather than conduct, in disregard of individual associational rights. *See Buckley*, 424 U.S. at 24–25; *McConnell v. Fed. Election Comm'n*, 540 U.S. 93 (2003) (invalidating ban on contributions by minors); *Green Party of Conn. v. Garfield*, 616 F.3d 189, 203–06 (2d Cir. 2010) (invalidating lobbyist contribution ban absent sufficient record).

f. Section 30a(1)(d) bans contributions to MPSC members, who are appointed, may not run for office, and are already barred from soliciting or accepting money from utilities, *see* Mich. Comp. Laws §§ 460.1, 15.341, 15.342—an impermissible "prophylaxis-upon-prophylaxis" approach, *see Cruz*, 596 U.S. at 306–07.

g. Section 30a(1)(e) and (3) ban contributions to entities that are merely "affiliated" with covered officials, including entities that make only independent expenditures, issue advocacy, or electioneering communications that merely reference a candidate during a 100-day pre-election window, and including entities whose only connection is that an official's agent, relative, or staff member solicited funds for it within two years.

h. Section 30a uses "affiliated" as a proxy for "coordinated," contrary to the principle that money flowing through independent actors does not carry the same risk of quid pro quo corruption. *NRSC*, 609 U.S. at 924; *McCutcheon*, 572 U.S. at 210–11. Independent expenditures do not give rise to quid pro quo corruption, *Citizens United*, 558 U.S. at 357–61; the risk of corruption "simply is not present in a popular vote on a public issue," *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 790 (1978); and restrictions on communications that merely reference candidates burden protected issue advocacy, *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462, 476–83 (2007).

i. Section 30a's 100-day window, *see* Mich. Comp. Laws §§ 169.230a(1)(e)(i), 169.205(4) (defining "electioneering communication"), far exceeds the federal 60-day period, *see* 52 U.S.C. § 30104(f)(3)(A)(i)(II)(aa). The government cannot show why a contribution made 99 days before an election presents a greater

threat of corruption than one made 101 days before. *See Virden v. City of Austin*, 127 F.4th 960, 967 (5th Cir. 2025); *Zimmerman v. City of Austin*, 881 F.3d 378, 392 (5th Cir. 2018).

j. Section 30a imposes retroactive liability: a contribution that is lawful when made becomes unlawful if the recipient later becomes "affiliated" with a covered official or later makes an expenditure or electioneering communication referencing that official, even though contributors have no control over third parties' later spending decisions. *See McCutcheon*, 572 U.S. at 210–11. That multiple-degree prophylaxis cannot be reconciled with *NRSC*, 609 U.S. at 930.

k. Section 30a bans contributions to state and local party committees and committees that contribute to covered candidates, even though those committees are independent actors. *See NRSC*, 609 U.S. at 921–30; *McCutcheon*, 572 U.S. at 210–12.

l. Section 30a is a permanent, total ban rather than a contribution limit, and it prohibits even de minimis contributions and "even symbolic expressions of support through a small contribution." *Deon*, 960 F.3d at 161; *see McCutcheon*, 572 U.S. at 220–21. Its sponsors never explained "why a flat prohibition is proportionate" to any interest in avoiding actual or perceived corruption. *Ball v. Madigan*, 245 F. Supp. 3d 1004, 1014 (N.D. Ill. 2017). As in *Lavin*, a "less

restrictive approach," such as "limiting campaign contributions . . . rather than banning them," was readily available. 689 F.3d at 548.

m. Section 30a ignores existing, narrower alternatives, including contribution limits, disclosure (which the Initiative itself expands), anti-conduit and attribution provisions, and MPSC recusal and ethics obligations, *see* Mich. Comp. Laws §§ 169.231, 169.241, 169.244(1), 169.270, 169.271, 460.1, 15.341, 15.342, and thus embodies the "prophylaxis-upon-prophylaxis approach" the Supreme Court has condemned, *Cruz*, 596 U.S. at 306–07; *NRSC*, 609 U.S. at 925–31.

n. Section 30a also contains no safe harbor, scienter requirement, delayed enforceability, temporal limitation, or 30-day return period. Instead, it imposes strict liability with a ten-times penalty, no knowledge requirement, no good-faith defense, and no opportunity to cure. Mich. Comp. Laws § 169.230a(4). That regime chills protected speech and association far beyond what is necessary to enforce any legitimate restriction.

129. Because Section 30a's categorical prohibition imposes "a severe and direct restriction on free speech" while serving, at most, as a highly attenuated defense against quid pro quo corruption, *NRSC*, 609 U.S. at 930, "[t]here is no avoiding the conclusion that the contribution ban . . . is not closely drawn," *Lavin*, 689 F.3d at 548.

130. The Plaintiffs are entitled to a declaration that Section 30a violates the First Amendment on its face and as applied to Plaintiffs, as well as preliminary and permanent injunctive relief prohibiting the Defendants from enforcing Section 30a against them.

**Count III**

**Unconstitutionally Void for Vagueness in Violation of the Fourteenth Amendment (42 U.S.C. § 1983)**

131. Plaintiffs incorporate the foregoing allegations.

132. "Due process requires that [the Court] hold a state enactment void for vagueness if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *United Food & Com. Workers Union, Loc. 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358–59 (6th Cir. 1998) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)).

133. "[T]he vagueness 'doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice.'" *Id.* (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988) (alteration in *United Food*)).

134. Section 30a "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

135. Section 30a(2) does not define or limit what it means for an entity to be "affiliated with" a utility. Neither does it define or limit what it means to be "directly or indirectly" "established, financed, maintained, or controlled" by the utility or one of its principals. *See* Mich. Comp. Laws § 169.230a(2). Expansive terms like "affiliated" and "indirectly" extend Section 30a's potential reach to individuals or entities with only a tenuous connection to the utility.

136. Under Section 30a(5)(d)(iii), "principal" includes a utility's "agent," but the statute does not define or limit the scope of a utility's "agent." Under Michigan law, this could sweep in each Utility Plaintiff's in-house and outside counsel, accountants, insurance brokers, government-affairs consultants, contractors, and many of its employees or other people or organizations acting in an agency capacity. *See* Mich. Comp. Laws § 169.230a(5)(d)(iii).

137. "Principal" also includes "immediate family" of a member of the board, a substantial owner, the utility's president, chief executive officer, treasurer, or "officer who holds similar responsibilities." *See* Mich. Comp. Laws § 169.230a(5)(d)(iv). Section 30a does not define or limit "immediate family" or an "officer who holds similar responsibilities."

138. Numerous other terms in Section 30a are unconstitutionally vague, as well, including the phrase "[d]irectly or indirectly established, finances, maintains, or controls the entity" (§ 169.230a(3)(a)); the phrase "executive or managerial capacity" (§ 169.230a(3)(c)); and the phrase "does not participate in and does not have

actual or implicit authority to affect the entity's decisions concerning spending" (§ 169.230a(3)(c)).

139. Section 30a does not provide Plaintiffs a "reasonable opportunity" to understand what Section 30a prohibits.

140. For these same reasons, Section 30a also "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill*, 530 U.S. at 732.

141. Section 30a's vague and potentially expansive scope raises the risk that the government will apply Section 30a arbitrarily or in a discriminatory fashion.

142. Section 30a therefore fails under the Due Process Clause's void-for-vagueness doctrine.

143. The Plaintiffs are entitled to a declaration that Section 30a violates the Fourteenth Amendment's Due Process Clause on its face and as applied, as well as preliminary and permanent injunctive relief prohibiting the Defendants from enforcing Section 30a against them.

## **Count IV**

## Violation of the Equal Protection Clause of the Fourteenth Amendment (42 U.S.C. § 1983)

144. Plaintiffs incorporate the foregoing allegations.

145. The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

146. Section 30a impermissibly targets utilities—and a broad swath of people associated with utilities—and restricts their rights to make political contributions based on that association.

147. Similarly situated entities and individuals, like other regulated industries, other corporations' employee PACs, labor organizations, and advocacy organizations, are not banned from making the same political contributions.

148. These distinctions are not narrowly tailored to any compelling or legitimate governmental interest, and Section 30a fails any level of scrutiny.

149. The Plaintiffs are entitled to a declaration that Section 30a violates the Fourteenth Amendment's Equal Protection Clause on its face and as applied to Plaintiffs, as well as preliminary and permanent injunctive relief prohibiting the Defendants from enforcing Section 30a against them.

## Relief Requested

For the foregoing reasons, the Plaintiffs respectfully request that the Court enter a judgment against the Defendants and award Plaintiffs the following relief:

a. Declare that Section 30a of the Michigan Campaign Finance Act, Mich. Comp. Laws § 169.230a, violates the First and Fourteenth Amendments to the United States Constitution, both on its face and as applied to Plaintiffs;

b. Preliminarily and permanently enjoin Defendants, their officers, agents, employees, and all persons acting in concert with them, from investigating, enforcing, or seeking to collect any civil fine against Plaintiffs for violations of Section 30a, Mich. Comp. Laws § 169.230a;

c. Award Plaintiffs their costs and reasonable attorneys' fees under 42 U.S.C. § 1988(b); and

d. Grant such other and further relief as the Court deems appropriate.

MILLER JOHNSON
Counsel for Plaintiffs

Dated: November 5, 2026

By /s/ Stephen J. van Stempvoort
Stephen J. van Stempvoort
Andrew C. Goetz
Amanda L. Rauh-Bieri
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1700
vanstempvoorts@millerjohnson.com
goetza@millerjohnson.com
rauhbieria@millerjohnson.com