IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CMS ENERGY CORPORATION; CONSUMERS ENERGY COMPANY; DTE ENERGY COMPANY; DTE ELECTRIC COMPANY; DTE GAS COMPANY; CMS ENERGY CORPORATION EMPLOYEES FOR BETTER GOVERNMENT; DTE ENERGY COMPANY POLITICAL ACTION COMMITTEE; CASE LANCASTER; and AYESHA LANCASTER,

Plaintiffs,

v.

JONATHAN BRATER, in his official capacity as the Director of the Michigan Bureau of Elections; DANA NESSEL, in her official capacity as Attorney General of the State of Michigan, or her successor in office; and JOCELYN BENSON, in her official capacity as Secretary of State of the State of Michigan, or her successor in office,

Defendants.

Case No. 1:26-cv-03168

Hon.

---

**Brief in Support of Plaintiffs' Motion for Preliminary Injunction**

**Oral Argument Requested**

## Table of Contents

**Page**

Table of Authorities ........ iii

Introduction ........ 1

Background ........ 3

A. The MMOP Initiative's Origins and Advocacy ........ 3

B. Section 30a's Utility-Focused Ban on Campaign Contributions ........ 5

C. The Plaintiffs' Complaint and Request for Injunctive Relief ........ 9

Argument ........ 11

Because section 30a violates the First Amendment and will chill protected political speech, its enforcement should be preliminarily enjoined ........ 11

A. The plaintiffs' First Amendment challenges to section 30a are likely to succeed on the merits. ........ 11

1. As its sponsors boasted, section 30a is unconstitutional speaker-based viewpoint discrimination. ........ 12

a. Government restrictions that favor some speakers over others are "presumptively unconstitutional." ........ 13

b. Section 30a was drafted and explicitly advertised as a means to exclude utilities and their allies from participating in the political process. ........ 16

2. Even if treated as a content-neutral restriction, section 30a violates the First Amendment. ........ 22

a. Section 30a is not directed toward the goal of preventing *quid pro quo* corruption—the only permissible governmental interest here. ........ 24

b. Section 30a's broad ban on campaign contributions by anyone affiliated with the utility industry is not "narrowly tailored" in any respect. .......... 29

B. The other preliminary-injunction factors, though secondary in this context, likewise support enjoining section 30a. .......... 40

Conclusion .......... 41

Certification .......... 42

## Table of Authorities

**Page(s)**

**Cases**

*Am. C.L. Union Fund of Michigan v. Livingston Cnty.*,
796 F.3d 636 (6th Cir. 2015) .................... 11

*Amelkin v. McClure*,
330 F.3d 822 (6th Cir. 2003) .................... 14

*Arthur v. City of Toledo, Ohio*,
782 F.2d 565 (6th Cir. 1986) .................... 18

*Ball v. Madigan*,
245 F. Supp. 3d 1004 (N.D. Ill. 2017) .................... 15, 16, 17, 18, 34, 39

*Buckley v. Valeo*,
424 U.S. 1 (1976) .................... 1, 14, 22, 30, 32, 34

*Cath. Charities of Jackson, Lenawee, & Hillsdale Ctys. v. Whitmer*,
162 F.4th 686 (6th Cir. 2025) .................... 11, 40

*Chiles v. Salazar*,
607 U.S. 627 (2026) .................... 2, 14, 22

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) .................... 11, 13, 14, 16, 21, 22

*City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*,
538 U.S. 188 (2003) .................... 18

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*,
447 U.S. 530 (1980) .................... 12

*Davis v. Fed. Election Comm'n*,
554 U.S. 724 (2008) .................... 21, 25, 28

*Deon v. Barasch*,
960 F.3d 152 (3d Cir. 2020) .................... 17, 34, 39

*Elrod v. Burns*,
427 U.S. 347 (1976) .................... 40

*Fed. Election Comm'n v. Beaumont*,
539 U.S. 146 (2003) .................... 23, 32, 33

*Fed. Election Comm'n v. Cruz*,
596 U.S. 289 (2022) .......... 24, 25, 27, 28, 29, 39

*Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*,
551 U.S. 449 (2007) .......... 38

*First Nat. Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978) .......... 2, 14, 15, 17, 30

*Free & Fair Election Fund v. Missouri Ethics Comm'n*,
252 F. Supp. 3d 723 (W.D. Mo. 2017) .......... 18

*Free & Fair Election Fund v. Missouri Ethics Comm'n*,
903 F.3d 759 (8th Cir. 2018) .......... 36

*G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*,
23 F.3d 1071 (6th Cir. 1994) .......... 41

*Green Party of Connecticut v. Garfield*,
616 F.3d 189 (2d Cir. 2010) .......... 26

*Lavin v. Husted*,
689 F.3d 543 (6th Cir. 2012) .......... 17, 26, 34, 35, 39

*McCutcheon v. Fed. Election Comm'n*,
572 U.S. 185 (2014) .......... 11, 12, 15, 22, 23, 24, 25, 27, 28, 29, 34, 35, 36, 38, 39

*Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*,
117 F.4th 389 (6th Cir. 2024) .......... 23

*Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*,
609 U.S. 908 (2026) .......... 2, 3, 12, 23, 24, 25, 27, 29, 32, 35, 36, 39, 40

*Protect My Check, Inc. v. Dilger*,
176 F. Supp. 3d 685 (E.D. Ky. 2016) .......... 15, 32

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) .......... 13, 14, 16

*Riddle v. Hickenlooper*,
742 F.3d 922 (10th Cir. 2014) .......... 15

*Schickel v. Dilger*,
925 F.3d 858 (6th Cir. 2019) .......... 14, 26

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) .......... 13, 18, 19

*Stephenson v. Golden*,
279 Mich. 710, 276 N.W. 849 (1937) ........................................................ 6

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
429 U.S. 252 (1977) ........................................................ 19

*Washington v. Seattle School Dist. No. 1*,
458 U.S. 457 (1982) ........................................................ 18

*Ex parte Young*,
209 U.S. 123 (1908) ........................................................ 10

**Statutes**

42 U.S.C. § 1983 ........................................................ 10

Ala. Code § 17-5-14(c) ........................................................ 27

Ga. Code Ann. § 21-5-30.1 ........................................................ 27

Ga. Code Ann. § 21-5-30(f) ........................................................ 27

Mich. Comp. Laws § 15.341 ........................................................ 7, 38

Mich. Comp. Laws § 15.342 ........................................................ 7, 38

Mich. Comp. Laws § 168.842(1) ........................................................ 5

Mich. Comp. Laws § 169.205(4) ........................................................ 8, 37

Mich. Comp. Laws § 169.206 ........................................................ 8, 37

Mich. Comp. Laws § 169.230a ........................................................ 5, 6, 7, 8, 9, 30, 33, 35, 36, 37

Mich. Comp. Laws § 169.230b ........................................................ 5, 9, 37

Mich. Comp. Laws § 169.231 ........................................................ 38

Mich. Comp. Laws § 169.241 ........................................................ 38

Mich. Comp. Laws § 169.244(1) ........................................................ 38

Mich. Comp. Laws § 169.247 ........................................................ 5

Mich. Comp. Laws § 169.251 ........................................................ 5

Mich. Comp. Laws § 169.255(1) ........................................................ 32

Mich. Comp. Laws § 169.270 .......... 38

Mich. Comp. Laws § 169.271 .......... 38

Mich. Comp. Laws § 460.1 .......... 7, 38

Miss. Code Ann. § 77-1-11 .......... 27

**Other Authorities**

Mich. Const. art. II, § 9 .......... 9

## Introduction

The First Amendment prohibits the government from silencing disfavored speakers or viewpoints. Especially on matters of public importance, the First Amendment protects "the widest possible dissemination of information from diverse and antagonistic sources" and assures the "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976).

That core principle resolves this case. For years, a group of advocacy organizations has opposed Michigan's two largest utility companies, DTE and Consumers, on significant questions of public policy, including rates, reliability, clean energy, and data centers. Unable to achieve their policy objectives through the ordinary political and regulatory process, those advocacy organizations then pursued a different approach. Dubbing themselves "Michiganders for Money Out of Politics," or "MMOP," the organizations sponsored a ballot initiative to restrict the utilities from participating in important aspects of the state's political process.

The result is section 30a of the recently approved MMOP ballot initiative. Section 30a broadly forbids the utility industry from making campaign contributions to state party or political committees, most candidates for state office, and most entities even loosely "affiliated" with those state candidates. It bans those contributions not only from DTE and Consumers (and every other utility regulated by the Michigan Public Service Commission), but also from every "principal" or "affiliated" entity of a utility, defined to sweep in many people and organizations with only a faint connection to utilities.

That far-reaching prohibition on campaign contributions cannot be reconciled with the First Amendment, and this Court should enter a preliminary injunction prohibiting section 30a's enforcement.

*First,* the First Amendment does not permit one side of a policy dispute to legislate the other side out of the debate. Restrictions that single out disfavored speakers or viewpoints are "blatant" violations of the First Amendment, *Chiles v. Salazar*, 607 U.S. 627, 641 (2026), and section 30a leaves no doubt about whom it disfavors or why. Section 30a's sponsors even *told* voters that they were targeting the utilities based on policy differences over profits, reliability, rates, and clean-energy policy. Those organizations are entitled to their opinions, but they may not silence competing views with one-sided campaign-finance restrictions. Because section 30a constitutes speaker-based viewpoint discrimination, it should be enjoined on that basis.

*Second,* even if treated as a content-neutral measure, section 30a fails the First Amendment's "closely drawn" scrutiny test governing restrictions on campaign contributions. The only permissible governmental interest in this context is preventing *quid pro quo* corruption or its appearance. *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 609 U.S. 908, 920–21 (2026). There is no evidence of such corruption by Michigan's utilities—no scandal, no exchange of official acts for money, no examples whatsoever. Proving the point, section 30a's proponents offered only slogans and generic references to "pay-to-play politics," "big money," and "corporate influence"—none of which suffice here. Nor is section 30a "closely drawn"

to anything. It ensnares people with no connection to any utility decision, many of whom have no reason to think they're prohibited donors. It eliminates the PAC and separate-segregated-fund channels that the Supreme Court has treated as essential; ignores the contribution limits, disclosure rules, anti-conduit rules, and state ethics rules already in place; and goes well beyond the laws of any other state. Narrowly tailored, this is not.

In a matter of days, the plaintiffs here must choose between surrendering their rights to political speech and association and risking substantial penalties for exercising them. That is irreparable harm, and the public gains nothing from the enforcement of an unconstitutional speech restriction. Section 30a should be preliminarily enjoined.

## Background

### A. The MMOP Initiative's Origins and Advocacy

Michiganders for Money Out of Politics is a coalition of advocacy organizations that have regularly opposed Michigan's utilities on policy issues such as rates, reliability, clean-energy legislation, and data centers. Exhibits 1–3. The coalition includes Clean Water Action, Climate Cabinet, Detroit Action, Hip Hop Caucus Action Fund, the Michigan League of Conservation Voters, Michigan United Action, MOSES Action, and Voters Not Politicians. *Id.*

The MMOP ballot initiative grew out of a long-running dispute between those advocacy organizations and Michigan's two largest utility companies, DTE and Consumers. Exhibit 4. According to those advocacy organizations, the initiative started taking shape in 2021, when one of the organizations began lobbying corporate

donors and protesting DTE and Consumers at shareholder meetings and the Mackinac Policy Conference. Exhibits 2, 5. The "nature of the problem" then "crystallized" in 2022, when those organizations opposed a DTE rate increase before the Michigan Public Service Commission and lost the argument. Exhibit 2.

The advocacy organizations responded by supporting legislation to bar utilities from making political contributions. Exhibit 6. When those bills never reached the House floor, the coalition blamed the utilities' support for legislators of both parties and resolved to take the issue directly to voters. Exhibit 2. They then did so, forming a ballot question committee and sponsoring the MMOP ballot initiative that was put before Michigan voters as Proposal 2 in the November 2026 election.

In advocating for the ballot initiative's passage, its sponsors doubled down on their long-running policy disputes with DTE and Consumers. They accused the utilities of "rak[ing] in billions while delivering some of the worst power reliability in the country" and "charging the highest rates in the Midwest." Exhibit 7. They argued that the initiative was needed to unlock "beneficial overall energy policy" on rates and data centers. Exhibit 8. They issued press releases attacking the utilities' rate-case filings, decrying "corporate greed," and accusing DTE of "control[ling] our politicians." Exhibits 9–10. And they assailed the utilities with generic but oft-repeated accusations of "pay-to-play politics," "big money," and "corporate influence." Exhibits 11–14.

The voters approved the MMOP initiative at the election on November 3, 2026. The official declaration of the vote is expected on or before November 23, 2026. *See*

Mich. Comp. Laws § 168.842(1). The new or revised Michigan statutes, as enacted or amended by the initiative, are attached to this brief. Exhibit 15.

### B. Section 30a's Utility-Focused Ban on Campaign Contributions

The MMOP initiative amends the Michigan Campaign Finance Act in two main ways. First, the provision at issue here—section 30a—bans the utility industry from making campaign contributions to most candidates for state office and any committees or entities even loosely affiliated with those candidates. Mich. Comp. Laws § 169.230a. Second, section 30b imposes a similar ban on campaign contributions from state contractors. Mich. Comp. Laws § 169.230b. The initiative also includes additional disclosure requirements. Mich. Comp. Laws §§ 169.247, 169.251.

In simplest terms, section 30a prohibits utilities, and many people and organizations even loosely affiliated with utilities (whether they know it or not), from making any campaign contributions connected to most state elections. Its prohibitions apply not only to any "electric utility" or "gas utility"—such as DTE or Consumers—but also to any "principal" of a utility and any "entity that is affiliated with" a utility. Mich. Comp. Laws § 169.230a(1). It defines both of those latter categories expansively. *See* Mich. Comp. Laws § 169.230a(2), (5). A "principal," for example, includes the utilities' board members, majority or "substantial" owners (meaning anyone with an "ownership interest" of 5% or more), and executives. Mich. Comp. Laws § 169.230a(5)(b), (d), (f). It includes any of those individuals' "[i]mmediate family" members. Mich. Comp. Laws § 169.230a(5)(d)(iv). It includes any of the utilities' "agent[s]," Mich. Comp. Laws § 169.230a(5)(d)(iii), which covers

not just their lobbyists but their in-house and outside counsel, accountants, insurance brokers, and potentially any other person or entity "having express or implied authority to represent or act on [the utilities'] behalf." *Stephenson v. Golden*, 279 Mich. 710, 734, 276 N.W. 849, 857 (1937). It even includes the "agent[s]" of the utilities' "principal[s]," Mich. Comp. Laws § 169.230a(5)(d)(iii), meaning that a utility executive's tax-preparer is now a prohibited donor. Also covered are any entities "affiliated" with a utility, meaning any entity that is "established, financed, maintained, or controlled"—whether "directly or indirectly"—by the "utility" or one of its "principals." Mich. Comp. Laws § 169.230a(2). Section 30a's prohibited donors, in short, cover a sprawling array of people and organizations—many of whom have no reason to think they are barred from making campaign contributions—simply because their political views were presumed to be sympathetic to utilities.

The categories of prohibited recipients are similarly expansive. Section 30a bars any campaign contributions, either "directly or indirectly," to "[t]he governor, attorney general, state senator, state representative, or a candidate for such office." Mich. Comp. Laws § 169.230a(1)(a). It bars contributions to "[a] state or local party committee." Mich. Comp. Laws § 169.230a(1)(b). It bars contributions to "[a] committee, other than an independent expenditure committee or ballot question committee, that makes contributions to" one of the identified candidates for state office. Mich. Comp. Laws § 169.230a(1)(c). And, somewhat oddly, it also bars contributions to members of the Michigan Public Service Commission. Mich. Comp. Laws § 169.230a(1)(d). Those MPSC members do not receive campaign contributions

*at all*: they are appointed (not elected), forbidden by statute from holding public office, and already prohibited by government ethics statutes from soliciting or accepting money from the utility industry. Mich. Comp. Laws §§ 460.1, 15.341, 15.342. Yet section 30a still includes them.

Section 30a then takes it a step further and bans contributions to most entities "affiliated with" the state candidates or officials identified above. Mich. Comp. Laws § 169.230a(1)(e), (3). Those "affiliated" entities include any entity "[d]irectly or indirectly established, finance[d], maintain[ed], or control[led]" by the state candidates or officials, or by any of their "agents, immediate family, or staff members." Mich. Comp. Laws § 169.230a(3)(a). With few exceptions, those "affiliated" entities also include any entity for which any of those people—officials, candidates, agents, immediate family, or staff members—"[h]as solicited funds . . . within the prior two years" or "[s]erves in an executive or managerial capacity." Mich. Comp. Laws § 169.230a(3)(b)–(c). And once an entity is deemed "affiliated" with the state official or candidate, the utilities and their affiliates are barred from contributing any money to that entity if it pays for a covered official's food or travel or spends more than $500 per election cycle on candidate-related advocacy. Mich. Comp. Laws § 169.230a(1)(e).

That candidate-related advocacy is defined as expansively as the rest of the statute. Mich. Comp. Laws § 169.230a(1)(e). It covers any "contributions to the person affiliated with the entity," any "expenditures in support of the person affiliated with the entity or opposing the person's opponent," or any "electioneering communications"

that "referenc[e] the person affiliated with the entity or the person's opponent." Mich. Comp. Laws § 169.230a(1)(e). An "electioneering communication," in turn, encompasses almost any "public communication" that "[r]eferences a clearly identifiable candidate" and is "targeted to the relevant electorate" in the month or months before an election, "regardless of whether the communication contains express advocacy." Mich. Comp. Laws § 169.205(4). The definition of "expenditure" is equally broad, covering almost any public communications advocating for or against a candidate or ballot question. Mich. Comp. Laws § 169.206.

The practical effect of section 30a's prohibitions is to impose liability—even retroactive liability—on anyone theoretically aligned with the utility industry who donates money to any entity even loosely affiliated with a candidate for state office, if that entity merely mentions a "clearly identifiable candidate" in any public communication before an election. A utility board member's 20-year-old daughter, for example, now cannot contribute to a pro-life or pro-choice organization if that organization publicly mentions a state candidate (or the candidate's opponent) and that candidate has solicited funds for the organization anytime during the last two years. Other pairs of donors and recipient organizations are similarly enmeshed in section 30a, merely because of the donor's perceived sympathies toward utilities and the organization's perceived connection to a candidate.

Unlike section 30b, moreover, section 30a's prohibitions lack a safe-harbor provision, a scienter requirement, or any mitigating circumstances if a candidate-affiliated entity decides to engage in "electioneering communication[s]" or make

"expenditure[s]" *after* receiving a contribution. *Compare* Mich. Comp. Laws § 169.230a(4) *with* Mich. Comp. Laws § 169.230b(7)–(8). So the utilities and their allies are now faced with an unappetizing choice: refrain from contributing any money to those entities entirely, or risk retroactive liability from decisions made by other people, outside of their control. And if they run afoul of section 30a, they face significant financial penalties. Mich. Comp. Laws § 169.230a(4).

Section 30a's prohibitions on the utility industry take effect almost immediately. Under the Michigan Constitution, a ballot initiative submitted to and approved by the voters generally "take[s] effect 10 days after the date of the official declaration of the vote." Mich. Const. art. II, § 9. And unlike section 30b, section 30a does not contain a delayed enforcement provision. *Compare* Mich. Comp. Laws § 169.230a *with* Mich. Comp. Laws § 169.230b(3).

### C. The Plaintiffs' Complaint and Request for Injunctive Relief

Section 30a prohibits the plaintiffs here from making campaign contributions. The DTE and Consumers plaintiffs—DTE Energy Company, DTE Electric Company, DTE Gas Company, CMS Energy Corporation, and Consumers Energy Company—are prohibited donors as "utilities," "principals," or "affiliated" entities. Complaint ¶¶ 11–15, 65–83; Exhibit 16, Mahoney Declaration; Exhibit 17, Kipp Declaration. The employee PAC plaintiffs—DTE Energy Company Political Action Committee and CMS Energy Corporation Employees for Better Government—are voluntary, non-partisan political action committees of DTE's and Consumers' employees, respectively, and are prohibited donors as utility-affiliated entities. Complaint ¶¶ 16–18, 84–101; Exhibit 16, Mahoney Declaration; Exhibit 17, Kipp Declaration. The

individual plaintiffs are prohibited donors because they are either personally employed by a utility at a senior level or "immediate family" of someone who is. Complaint ¶¶ 19–21, 102–07; Exhibit 18, Case Lancaster Declaration; Exhibit 19, Ayesha Lancaster Declaration.

The plaintiffs all want the ability to exercise their rights to political association and expression using campaign contributions, including campaign contributions to candidates and organizations prohibited by section 30a. Complaint ¶¶ 65–109; Exhibit 16, Mahoney Declaration; Exhibit 17, Kipp Declaration; Exhibit 18, Case Lancaster Declaration; Exhibit 19, Ayesha Lancaster Declaration. And in their complaint here, the plaintiffs have brought claims under the United States Constitution, 42 U.S.C. § 1983, and *Ex parte Young*, 209 U.S. 123 (1908), seeking declaratory and injunctive relief against section 30a's enforcement. Complaint ¶¶ 25–29, 110–49. Because section 30a violates the First Amendment, the Court should now grant the plaintiffs a preliminary injunction, prohibiting the defendants from enforcing section 30a.

## Argument

**Because section 30a violates the First Amendment and will chill protected political speech, its enforcement should be preliminarily enjoined.**

Section 30a of the MMOP initiative violates the First Amendment, and the Court should issue a preliminary injunction prohibiting its enforcement. In deciding whether to grant a preliminary injunction, courts typically consider four factors: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff is likely to suffer irreparable harm absent an injunction; (3) the balance of the equities; and (4) the public interest. *Cath. Charities of Jackson, Lenawee, & Hillsdale Ctys. v. Whitmer*, 162 F.4th 686, 692 (6th Cir. 2025). But in First Amendment cases, "the public's interest and any potential harm to the parties or others largely depend on the constitutionality of the state action." *Am. C.L. Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015). Thus, the "crucial inquiry" for a preliminary-injunction motion under the First Amendment is "whether the plaintiff has demonstrated a likelihood of success on the merits." *Id.*

### A. The plaintiffs' First Amendment challenges to section 30a are likely to succeed on the merits.

On the merits, section 30a violates the First Amendment many times over. The First Amendment, incorporated against the states by the Fourteenth Amendment, "safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014). Its protections "extend[] to corporations." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010). And those same protections extend to utilities operating as "a privately owned but government regulated monopoly."

*Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 534 n.1 (1980).

The First Amendment embodies "a profound national commitment" to "uninhibited, robust, and wide-open" debate on issues of public importance. *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n* ("*NRSC*"), 609 U.S. 908, 917 (2026). Its "fullest and most urgent" protections extend to "campaigns for public office," because "[t]here is no right more basic in our democracy than the right to participate in electing our political leaders." *McCutcheon*, 572 U.S. at 191–92.

Those First Amendment protections include "the right to participate in democracy through political contributions." *Id.* at 191. When contributing to a political campaign, a person or organization exercises both the right to political expression and the right to political association. *Id.* at 203. A campaign contribution "serves as a general expression of support for the candidate and [the candidate's] views." *Id.* It also "serves to affiliate" the contributor "with a candidate." *Id.* While the right to make campaign contributions is "not absolute," *id.* at 191, the government "bears the burden of proving the constitutionality of its actions" when restricting that speech, *NRSC*, 609 U.S. at 919. The government cannot meet that burden for section 30a.

**1. As its sponsors boasted, section 30a is unconstitutional speaker-based viewpoint discrimination.**

Section 30a is unique—and not in a good way. Unlike most restrictions on campaign contributions, which generally treat all individuals or corporate entities in the same way, section 30a directs its prohibitions toward particular *speakers*. It

targets utilities, their leaders and allies, and even those people's family members. In pushing that approach, the MMOP initiative's sponsors were upfront about their motives: their views differed from the utilities' views on issues of public importance, and they wanted to put a state-enforced thumb on the scale against the utilities' political advocacy. But the First Amendment does not permit one side of a policy debate to stifle the other side's speech, and it does not permit section 30a to do so here.

#### a. Government restrictions that favor some speakers over others are "presumptively unconstitutional."

At its core, the First Amendment prohibits the government from restricting speech based on its content. "Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United*, 558 U.S. at 340–41. Content-based restrictions are "presumptively unconstitutional," and they may be justified only in the rare instances in which they satisfy strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Strict scrutiny applies not only "when a law is content based on its face," but also "when the purpose and justification for the law are content based." *Id.* at 166.

Especially in the political arena or on matters of public importance, content-based restrictions virtually never satisfy strict scrutiny. "Those who seek to censor or burden free expression often assert that disfavored speech has adverse effects." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011). But the concept that the government "may restrict the speech of some elements of our society in order to enhance the relative voice of others" is "wholly foreign to the First Amendment."

*Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976). When the "suppression of speech suggests an attempt to give one side of a debatable public question an advantage in expressing its views to the people, the First Amendment is plainly offended." *First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 785–86 (1978); *accord Chiles v. Salazar*, 607 U.S. 627, 640–41 (2026).

One commonly disguised form of content-based speech restrictions is *speaker*-based restrictions. "Speech restrictions based on the identity of the speaker are all too often simply a means to control content," and the First Amendment provides "no basis" for "the proposition that, in the context of political speech, the government may impose restrictions on certain disfavored speakers." *Citizens United*, 558 U.S. at 340–41. To the contrary, when the government "discriminat[es] among viewpoints"—especially based on "the specific motivating ideology or the opinion or perspective of the speaker"—those restrictions serve as a "more blatant" and "egregious form of content discrimination." *Reed*, 576 U.S. at 168–69. A statute is therefore "constitutionally suspect" if it "single[s] out a small group for unfavorable treatment based either on the content or the viewpoint of the group's speech." *Amelkin v. McClure*, 330 F.3d 822, 828 (6th Cir. 2003); *see also Schickel v. Dilger*, 925 F.3d 858, 876 (6th Cir. 2019) ("*Reed*, at bottom, teaches us to be wary of speaker-based restrictions that are nothing more than content-based restrictions in disguise.").

Those same basic principles prohibit speaker-based viewpoint discrimination in the campaign-finance context. *See Citizens United*, 558 U.S. at 340–41. Although the Supreme Court has "permit[ted] the government to regulate campaign

contributions to some extent," the First Amendment "does not give the government free rein to selectively impose contribution restrictions in a manner that discriminates based on content or viewpoint." *Ball v. Madigan*, 245 F. Supp. 3d 1004, 1011 (N.D. Ill. 2017). Rather, when campaign-finance restrictions are based on viewpoint discrimination—whether content-based on their face, or speaker-based as a proxy for controlling content—"the First Amendment is plainly offended." *Bellotti*, 435 U.S. at 785–86. And while some courts have evaluated those content- or speaker-based restrictions under the Equal Protection Clause, rather than the First Amendment, the result has been the same. *See, e.g.*, *Riddle v. Hickenlooper*, 742 F.3d 922, 925–30 (10th Cir. 2014); *Protect My Check, Inc. v. Dilger*, 176 F. Supp. 3d 685, 690–92 (E.D. Ky. 2016); *see also Riddle*, 742 F.3d at 931–32 (Gorsuch, J., concurring) (explaining that "the strictest degree of scrutiny is warranted" when campaign-contribution restrictions "*discriminate* against some persons in the exercise of" their First Amendment rights).

By contrast, *content-neutral* limits on campaign expenditures and campaign contributions are generally subjected to differing levels of scrutiny, depending on the type of restriction. *See McCutcheon*, 572 U.S. at 196–97. But that general framework does not address the central problem with section 30a. That central problem is unabashed speaker-based viewpoint discrimination, through which one side of a political debate seeks to censor specific speakers and political advocacy on the other side.

**b. Section 30a was drafted and explicitly advertised as a means to exclude utilities and their allies from participating in the political process.**

Whether reviewed under the First Amendment or through an equal-protection lens, section 30a violates the United States Constitution in directing its prohibitions toward a specific group of disfavored speakers. Section 30a is discriminatory on its face, because it identifies its disfavored speakers by name—based solely on the "identity" or "perspective" of the speaker—and then disables only those speakers from engaging in protected political association. *Reed*, 576 U.S. at 168–70; *Citizens United*, 558 U.S. at 340–41. It applies only to utilities and people or entities affiliated with utilities, and it does not impose the same prohibitions on any other state-regulated or state-licensed groups. It then forbids its targeted class, and that class alone, from making contributions or donations to most candidates for state office and a long list of organizations even tangentially affiliated with those candidates. That is speaker-based viewpoint discrimination: the legality of the campaign contribution turns at the threshold on who the speaker is and whether that speaker is connected to the utility industry. By "singling out" particular speakers in this way, section 30a reflects the type of "content or viewpoint preference" that the First Amendment prohibits. *Ball*, 245 F. Supp. 3d at 1011; *accord Reed*, 576 U.S. at 168–70.

Section 30a's rationale has no limiting principle. It could easily be extended to other "disfavored" groups or industries across the political spectrum. The MMOP initiative's sponsors, for instance, announced here that they had been "working closely" with organized labor and promised that unions would "not be impacted by the [MMOP initiative's] policy changes." Exhibit 12. But if the First Amendment does

not protect utilities from speaker-based targeting today, nothing stops those unions and their allies from being targeted tomorrow. The same is true of many other groups and industries that are controversial (or not) and regularly interface with state regulators and policy-makers: casinos, pharmaceutical companies, universities, auto insurers, clean-energy companies (which would include many utilities), cannabis growers, banks, credit unions, big tech, liquor stores, abortion clinics, cable and internet providers, the film industry, many types of non-profits, and even some first responders. Many of those groups' popularity fluctuates over time and varies by partisan affiliation. If section 30a "may direct [utilities] to 'stick to business,'" nothing prevents the next ballot proposal or legislative initiative from "limit[ing] other corporations—religious, charitable, or civic—to their respective 'business'" in the same way. *Bellotti*, 435 U.S. at 785.

Likely for that reason, industry-based contribution bans have fared poorly when challenged under the First Amendment. The Sixth Circuit struck down Ohio's ban on contributions by Medicaid providers. *Lavin v. Husted*, 689 F.3d 543, 547–48 (6th Cir. 2012). The Third Circuit struck down Pennsylvania's ban on contributions by the gaming industry. *Deon v. Barasch*, 960 F.3d 152, 159–64 (3d Cir. 2020). The Northern District of Illinois gave the same treatment to a contribution ban on the cannabis industry, emphasizing that the ban "conspicuously" focused on "a highly limited subset" of the otherwise "broad category of entities that require state licensure or otherwise stand to gain financially from certain state action." *Ball*, 245 F. Supp. 3d at 1010–17. And the Western District of Missouri took a similarly dim

view of a voter-enacted contribution ban on "heavily regulated industries." *Free & Fair Election Fund v. Missouri Ethics Comm'n*, 252 F. Supp. 3d 723, 743–47 (W.D. Mo. 2017), *aff'd*, 903 F.3d 759 (8th Cir. 2018). The Midwest, in sum, has faced no shortage of industry-targeted contribution bans—and no shortage of federal courts striking them down.

In none of those cases, moreover, was the speaker-based viewpoint discrimination as blatant as in section 30a. Section 30a's focus goes well beyond merely creating "serious doubt" about the law's true intent. *Ball*, 245 F. Supp. 3d at 1015. That discriminatory intent, rather, was the entire reason for the law. As "[i]n the ordinary case," then, it is "all but dispositive to conclude that [section 30a] is content based and, in practice, viewpoint discriminatory." *Sorrell*, 564 U.S. at 571.

Indeed, the MMOP initiative's sponsors were candid about those impermissible motives. When evaluating a law enacted by ballot initiative or referendum in related contexts, courts have generally refrained from finding discriminatory animus based on a few "independent statements by private citizens." *City of Cuyahoga Falls, Ohio v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 197 (2003); *accord Arthur v. City of Toledo, Ohio*, 782 F.2d 565, 573–74 (6th Cir. 1986). But that rule gives way when evaluating "statements made by decisionmakers or referendum *sponsors*." *Buckeye Cmty. Hope Found.*, 538 U.S. at 196–97 (emphasis added). Statements by those sponsors, especially when made "during" the electorate's "deliberation," "may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative." *Id.* at 196–97 (citing *Washington v. Seattle School Dist. No. 1*, 458

U.S. 457, 471 (1982), and *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977)). And here, the MMOP initiative's sponsors drafted and designed section 30a to remove "particular speakers" and "content" from Michigan politics. *Sorrell*, 564 U.S. at 567. They sold section 30a to the public by contending that the utilities' policy views were bad, that the state's elected and appointed decisionmakers should not have agreed with those policy views, and that section 30a was imperative to ensure that the utilities could not support state officials or candidates who might align with them.

The MMOP initiative's official website, for example, was not subtle that section 30a was singling out utilities for their advocacy and perspective on public-policy matters. The website's home page put those policy differences front and center, accusing DTE and Consumers of using "political contributions" to "get away with" supposed problems regarding "power reliability" and "rates." Exhibit 1. The website even traced section 30a's origins to a specific policy debate over a 2022 DTE rate increase. Exhibit 2. According to the website, "public pressure" had reduced that rate increase "nearly 90%," but DTE "made another request and got what they were denied the first time." *Id.* Because DTE convinced the MPSC that this rate increase was necessary (under a narrow and established regulatory framework and in a public proceeding), the MMOP initiative's backers contrived section 30a to restrict what they viewed as "the influence these corporations have over their regulators." *Id.* The MMOP initiative's official press releases put forward the same message, attacking

DTE's and Consumers' rate-case filings as "corporate greed" and asserting that a "yes" vote would put an end to it. Exhibit 10.

In the same vein were statements from the MMOP initiative's co-chairs. One co-chair highlighted those policy clashes in an op-ed near the campaign's outset, stating that, "[i]nstead of investing the ratepayer dollars . . . in making sure that they prioritize service delivery and keeping utility rates low, [the utilities] prioritize shareholder payouts, political giving, and CEO salaries." Exhibit 20. She also pointed to the Legislature's failure to pass the ratepayer legislation she favored. *Id.* In another op-ed, she declared that utility spending "prevents meaningful changes to utility regulation," criticized the utilities for "steamroll[ing] opponents" on data-center tax legislation, and emphasized that the MMOP initiative would clear the way for "beneficial overall energy policy." Exhibit 8. MMOP's other co-chair demanded that lawmakers "overcome the bad faith objections being posed by the big utilities" and pass clean-energy legislation, predicting that "DTE and Consumers are going to spend as much money as it takes fighting us on this." Exhibits 21–22. And he accused the utilities of using their influence to "distort[] decisions about energy rates, pollution standards, insurance regulations, workplace protections and long-term investments in our future." Exhibit 23.

The advocacy organizations behind the MMOP initiative were equally upfront about their motives. Michigan United Action accused DTE and Consumers of "rak[ing] in billions while delivering some of the worst power reliability in the country" and "charging the highest rates in the Midwest," and stated that regulated

companies use "campaign cash to protect sweetheart deals and kill reforms." Exhibit 7. Clean Water Action warned that climate legislation was at risk because of the "corrosive influence of big utility money in Lansing." Exhibit 21. Climate Cabinet complained that pro-climate officials "have historically been outgunned by anti-climate interests with deep pockets." Exhibit 24.

All of those MMOP sponsors can, and often do, support and affiliate with candidates who support their own views, sometimes directly and sometimes indirectly. And many of those organizations have long opposed the utilities' policy positions before state government. Those organizations could have chosen to put those specific *policy* disputes before the electorate, where they would have been forced to debate the merits of their positions and defend their views on those issues. But rather than continuing to answer the utilities' speech with "more speech"—our country's law and tradition, and the First Amendment's "governing rule"—they decided to invest in state-sanctioned restrictions on their opponents' political advocacy. *Citizens United*, 558 U.S. at 361.

Those restrictions are speaker-based viewpoint discrimination, plain and simple, and they are "antithetical to the First Amendment." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 742 (2008). By drawing lines based on whether a campaign contributor is, or is not, affiliated with utilities in some way, section 30a boxes out part of the political debate. In doing so, it bars utilities and their presumptive allies from financially supporting candidates who share their views on issues that affect them. Any organizations with opposing views, by contrast—such as section 30a's

sponsors—face no such restrictions, other than those that already apply across the board in Michigan.

The First Amendment prohibits a campaign-finance law from loading the public debate in that way. As the Supreme Court recently stressed, "[a] law drawing a line based on the 'ideology' of the speaker—disadvantaging one view and advantaging another—skews the marketplace of ideas our society depends on to discover truth." *Chiles*, 607 U.S. at 656 (Kagan, J., concurring); *accord id.* at 640–41 (majority opinion). So a law may not leave one side of the debate free to support their preferred candidates while barring the other side from doing the same. *See Citizens United*, 558 U.S. at 340–41; *Buckley*, 424 U.S. at 48–49. In taking that approach here, section 30a commits a "blatant" violation of "bedrock First Amendment principle[s]." *Chiles*, 607 U.S. at 641. It should be enjoined on that basis.

**2. Even if treated as a content-neutral restriction, section 30a violates the First Amendment.**

Even if evaluated under the traditional First Amendment framework governing content-neutral campaign-finance laws, section 30a falls well short. When the government seeks to restrict *any* political speech, including campaign expenditures or contributions, it must show that the restriction "'avoid[s] unnecessary abridgement' of First Amendment rights." *McCutcheon*, 572 U.S. at 199 (quoting *Buckley*, 424 U.S. at 25). Under the Supreme Court's existing framework, that burden differs slightly depending on what the government seeks to limit—campaign expenditures or campaign contributions. *Id.* at 196–97. Restrictions on campaign expenditures are subject to strict scrutiny: the restriction passes muster

only if it "promotes a compelling interest and is the least restrictive means to further the articulated interest." *Id.* at 197. Restrictions on campaign contributions face "closely drawn" scrutiny, a "lesser but still rigorous standard of review" under which the government "must demonstrate 'a sufficiently important interest' and employ means 'closely drawn' to that interest." *NRSC*, 609 U.S. at 920 (quoting *McCutcheon*, 572 U.S. at 197).

Several thoughtful jurists have contended that strict scrutiny should apply to campaign-finance restrictions across the board and that the Supreme Court's older cases on that score rest on increasingly shaky ground. *See, e.g.*, *McCutcheon*, 572 U.S. at 228–32 (Thomas, J., concurring); *Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 163–64 (2003) (Kennedy, J., concurring); *id.* at 164–65 (Thomas and Scalia, JJ., dissenting). That argument carries particular force for section 30a. The plaintiffs here are therefore preserving that argument for further review, while acknowledging that this Court must "leav[e] to [the Supreme Court] the prerogative of overruling its own decisions." *Nat'l Republican Senatorial Comm. v. Fed. Election Comm'n*, 117 F.4th 389, 394 (6th Cir. 2024) (en banc), *rev'd*, 609 U.S. 908 (2026).

It should not matter here anyway. In practice, as the Supreme Court recently emphasized, any "subtle differences" between strict scrutiny and "closely drawn" scrutiny are often "academic." *NRSC*, 609 U.S. at 920; *accord McCutcheon*, 572 U.S. at 199. To satisfy "closely drawn" scrutiny, any limits on campaign contributions must still vindicate a legally "permissible" and "sufficiently important" governmental interest. *NRSC*, 609 U.S. at 920–22. And the contribution restrictions must still

"employ means 'closely drawn' to" that governmental interest. *Id.* at 920 (quoting *McCutcheon*, 572 U.S. at 197). Section 30a fails on both points.

**a. Section 30a is not directed toward the goal of preventing *quid pro quo* corruption—the only permissible governmental interest here.**

Section 30a trips over the first hurdle of "closely drawn" scrutiny because it does not pursue the only governmental interest permitted by the Supreme Court. To justify a restriction on campaign contributions, "the government must prove at the outset that it is in fact pursuing a legitimate objective." *Fed. Election Comm'n v. Cruz*, 596 U.S. 289, 305 (2022). And because all of the "asserted interests" supporting section 30a are those that the Supreme Court has rejected as "impermissible," *NRSC*, 609 U.S. at 920–21, section 30a violates "closely drawn" scrutiny from the get-go, without even considering whether the law is narrowly tailored.

The Supreme Court has recognized "only one permissible ground for restricting political speech: the prevention of '*quid pro quo*' corruption or its appearance." *Cruz*, 596 U.S. at 305. That governmental interest is narrow and "specific." *NRSC*, 609 U.S. at 923. It refers only to preventing "contributions in exchange for official action"—"a direct exchange of an official act for money." *Id.*

Any other asserted governmental interests are constitutionally forbidden. The Supreme Court has declined to endorse "a broader conception of corruption" as justifying campaign-contribution restrictions, *McCutcheon*, 572 U.S. at 208, and the Court has "consistently rejected attempts to restrict campaign speech based on other legislative aims," *Cruz*, 596 U.S. at 305. "Reduc[ing] the amount of money in politics" is not a permissible goal. *Id.* Nor is "equalizing the relative ability of individuals and

groups to influence the outcome of elections." *Davis*, 554 U.S. at 741. Nor is "limit[ing] the general influence a contributor may have over an elected official." *Cruz*, 596 U.S. at 305. Time and again, under the Supreme Court's "more recent First Amendment precedents," the Court has held that "prevent[ing] or reduc[ing] influence, ingratiation, gratitude, access, or the like for those who spend in support of, or contribute to, political parties or candidates" is "not a constitutionally permissible" governmental interest. *NRSC*, 609 U.S. at 923. And although the line between *quid pro quo* corruption and "general influence" can "seem vague at times," the First Amendment requires "err[ing] on the side of protecting political speech rather than suppressing it." *McCutcheon*, 572 U.S. at 209.

Section 30a's proponents did not put forward *any* evidence or examples of *quid pro quo* corruption involving Michigan's utilities. Instead, even when they pivoted away from bashing utilities based on their policy views, section 30a's proponents put forward only *general* allegations of "influence," "corruption," "pay-to-play politics," "big money," "special interests," and similar catchphrases. *E.g.*, Exhibits 11–12. But to satisfy the First Amendment, section 30a's proponents had to do more than merely mouth the word "corruption" or recite other abstract buzzwords. They had to show "something specific": a documented history of elected officials in Michigan making "a direct exchange of . . . official act[s] for money" from utilities. *NRSC*, 609 U.S. at 923.

Michigan's utilities have no history of *quid pro quo* corruption that might support those accusations. Section 30a's proponents thus did not, and could not, identify any record of utility-specific corruption in Michigan, any comparable scandal,

or any reason to believe that existing contribution limits, disclosure rules, anti-conduit rules, and recusal obligations are insufficient. Because section 30a did not rest on the only permissible governmental interest here—or cite any evidence or examples in support of that interest—section 30a does not pass muster under the First Amendment.

The Sixth Circuit reached a similar conclusion on similar facts in *Lavin*, 689 F.3d at 547–48. There, as here, the state sought to justify a campaign-contribution ban on Medicaid providers by nodding toward a general interest in "prevent[ing] corruption." *Id.* at 547. But the First Amendment required more. As the Sixth Circuit explained, the government "must do more than merely *recite* a general interest in preventing corruption." *Id.* What it must do, instead, is "demonstrate" a specific connection between the contribution ban and a record of *quid pro quo* corruption. *Id.* As here, however, the government in *Lavin* offered "no evidence" of that corruption between the state's Medicaid providers and the candidates barred from receiving contributions. *Id.* at 547–48. And as here, that absence of evidence contrasted with cases in which a state *did* have a sufficient record to support a contribution restriction. *See id.* at 547 (distinguishing *Green Party of Connecticut v. Garfield*, 616 F.3d 189 (2d Cir. 2010)); *see also Schickel*, 925 F.3d at 869–76 (distinguishable for the same reason). As in *Lavin*, then, any attempt to connect section 30a with the only permissible governmental interest here—preventing *quid pro quo* corruption or its appearance—"is dubious at best." 689 F.3d at 548.

Reinforcing that point, no other state (or the federal government) currently views the risk of *quid pro quo* corruption in this context as sufficient to support a similar type of restriction on utilities. "In the campaign finance context," the Supreme Court "has often looked to the experience of the states." *NRSC*, 609 U.S. at 929 (citing *McCutcheon*, 572 U.S. at 209–10 & n.7, and *Cruz*, 596 U.S. at 307). And when other states "do not impose a particular campaign-finance restriction," that "absence of evidence of resulting *quid pro quo* corruption is a strong sign that the concern is too speculative to support such a restriction." *Id.* That is true here. Only three states appear to impose any utility-specific restrictions on campaign contributions, and each of those restrictions is keyed to races for the state's *elected* utility commission. *See* Ala. Code § 17-5-14(c); Ga. Code Ann. §§ 21-5-30.1, 21-5-30(f); Miss. Code Ann. § 77-1-11. Zero states with an appointed commission, like Michigan, single out the utility industry as section 30a does. And there is no evidence that Michigan's utilities pose such a unique risk of *quid pro quo* corruption that section 30a somehow vindicates that governmental interest.

Indeed, by the MMOP proponents' own admission, section 30a is directed at governmental interests that the Supreme Court has condemned as impermissible under the First Amendment:

*Reducing the amount of money in politics.* The MMOP initiative's sponsors urged that "it's long past time to get utility money out of politics," and they sought to "restrain the power of large corporations that spend millions each year . . . to influence the decisions of lawmakers." Exhibits 25–26. The initiative's official website latched

onto that goal, focusing heavily on the initiative's effects on reducing money in politics. Exhibits 11–12.

*Equalizing relative influence.* The MMOP initiative's sponsors described section 30a as a way "to help working people in Michigan have a level playing field and get their voices heard again in Lansing," and to stop utilities from "drowning out the voices of regular folks" and "every other Michigander." Exhibits 20, 27. The initiative's official website made the same pitch. Exhibit 1.

*Limiting general influence and access.* In justifying section 30a, the MMOP initiative's sponsors blanketed the public with calls to reduce the utilities' "influence" in state government. Exhibits 11–14. They put that interest front and center in their op-eds, as well as on the initiative's official website. Exhibits 11–14, 26.

None of those asserted goals are permissible governmental interests under the First Amendment. *NRSC*, 609 U.S. at 920–23; *Cruz*, 596 U.S. at 305; *McCutcheon*, 572 U.S. at 208–09; *Davis*, 554 U.S. at 741–42. Instead, each of them conflicts with "a central feature of democracy": "that constituents support candidates who share their beliefs and interests, and candidates who are elected can be expected to be responsive to those concerns." *McCutcheon*, 572 U.S. at 192. The First Amendment thus prohibits such "legislative attempts to 'fine-tune' the electoral process" based on those goals, even when "well intentioned." *Id.* at 207.

Even the initiative's *name* here—"Michiganders for Money Out of Politics"—maps directly onto an asserted interest that the First Amendment prohibits. *McCutcheon*, 572 U.S. at 191 ("[W]e have made clear that [the government] may not

regulate contributions simply to reduce the amount of money in politics."). It is rare for a piece of enacted legislation to announce so openly that it conflicts with Supreme Court precedent and the United States Constitution. But having taken that approach, section 30a's sponsors cannot now run from it. Section 30a is not pursuing a constitutionally "legitimate objective," and it should be enjoined on that basis. *Cruz*, 596 U.S. at 305.

#### b. Section 30a's broad ban on campaign contributions by anyone affiliated with the utility industry is not "narrowly tailored" in any respect.

Section 30a also fails at the tailoring step because it takes a maximalist approach to restricting campaign contributions by utilities. Under "closely drawn" scrutiny, campaign-contribution restrictions "may not be 'disproportionate' and must be 'necessary' and 'narrowly tailored' to [their] asserted goal." *NRSC*, 609 U.S. at 920 (quoting *McCutcheon*, 572 U.S. at 199). To uphold the restrictions, the government must demonstrate a "fit" between the particular limits and the prevention of *quid pro quo* corruption. *Id.*

Section 30a is not a calibrated contribution limit. It is a total ban: an immediate, across-the-board prohibition imposed on Michigan's utilities, utility-affiliated entities, principals, agents, 5% owners, and immediate family members. It reaches contributions to candidates for state office, state and local party committees, other political committees, and entities affiliated with covered officials or candidates. And it does so regardless of whether the particular contribution context could plausibly give rise to any risk of *quid pro quo* corruption.

*First,* in banning campaign contributions from any "principal" or "entity affiliated with [a] . . . utility," section 30a sweeps in a wide array of people and entities with no plausible corruption nexus. Mich. Comp. Laws § 169.230a(1), (2), (5). It bars campaign contributions from an adult child of a utility executive, a spouse or parent with no utility role, an outside accountant or attorney who performed a few hundred dollars of services for a utility, an institutional investor or index fund holding a 5% ownership interest in a utility, and any organization that has received any "direct[] or indirect[]" financing or assistance from any of those people or organizations. Many of those prohibited donors have no reason to know, or even suspect, that section 30a ropes them in. Nor does Michigan have any record of those people or organizations engaging in *quid pro quo* corruption involving utilities. And all of those prohibited donors have the right to make campaign contributions as an exercise of political support and association under the First Amendment. *Buckley*, 424 U.S. at 24–25. In bringing those people and organizations within its ambit, section 30a jettisons any pretense of narrow tailoring and instead adopts a guilt-by-association regime.

Take one of the plaintiffs here, Ayesha Lancaster. A retired Michigan schoolteacher who stays politically informed, Ms. Lancaster regularly makes small-dollar contributions through ActBlue to Democratic candidates, including candidates for state office. Exhibit 19, Ayesha Lancaster Declaration ¶¶ 9–11. This election cycle, for instance, she made several $10 contributions to Jocelyn Benson and a $10 contribution to Eli Savit. Exhibit 19, Ayesha Lancaster Declaration ¶ 14. Yet under section 30a, Ms. Lancaster is now a prohibited donor, solely because her adult son,

plaintiff Case Lancaster, is a DTE executive. Exhibit 19, Ayesha Lancaster Declaration ¶¶ 16–17; Exhibit 18, Case Lancaster Declaration ¶ 5. Ms. Lancaster's campaign contributions pose zero risk of *quid pro quo* corruption—less than zero, if that were possible. And her individual contributions fall at the heart of protected political expression and association, made all the more important (in Ms. Lancaster's view) because of the money flowing into politics from other sources. Exhibit 19, Ayesha Lancaster Declaration ¶¶ 9, 12. Ms. Lancaster might wonder, for instance, why her $10 campaign contributions are now forbidden as too dangerous to democracy, but the $5.4 million that the MMOP ballot committee received from an out-of-state interest group remains protected speech. *See* Exhibit 27. Section 30a, however, now bars Ms. Lancaster from contributing to most state candidates.

The Lancasters are not alone. Under section 30a, a utility executive cannot contribute to a state senator or state representative who shares his or her views on tax policy. The executive's spouse cannot contribute to the Democratic Governors Association if the association covers the cost for its current vice-chair, Governor Whitmer, to travel to an association meeting or eat lunch. An independent director who serves on a utility's board cannot contribute to his or her own (non-utility) business's employee political action committee that contributes to state candidates. Even the board member's personal attorney is barred from donating to any of those candidates. And a trade or business organization that receives dues or event sponsorships from a utility—and is therefore "financed" by the utility—is prohibited from making contributions of its own to many entities of its choosing. With such

staggering breadth, section 30a abandons any suggestion of "narrow[] tailor[ing]." *NRSC*, 609 U.S. at 920.

*Second,* in prohibiting *all* utilities and utility-affiliated organizations from making campaign contributions, section 30a crosses a line that the Supreme Court has long drawn in the corporate-contribution context. The Supreme Court has previously upheld bans on corporate contributions only when "the corporation still can participate in the political process through a PAC or a separate segregated fund (SSF)." *Protect My Check, Inc.*, 176 F. Supp. 3d at 693–94 (citing *Beaumont*, 539 U.S. at 163, and *Buckley*, 424 U.S. at 29 n.31). The Court emphasized as much when upholding the federal ban in *Beaumont*, pointing out that PACs and SSFs "allow[] corporate political participation without the temptation to use corporate funds for political influence" and permit the government to "regulate campaign activity through registration and disclosure, without jeopardizing the associational rights of advocacy organizations' members." 539 U.S. at 163. And prior to section 30a, Michigan's framework largely mirrored the federal framework on that subject, banning direct corporate contributions to candidates while permitting PACs or SSFs as "connected organizations." Mich. Comp. Laws § 169.255(1). Those PACs or SSFs could then donate to candidate committees, political party committees, and other organizations engaged in candidate-specific advocacy. Mich. Comp. Laws § 169.255(1).

The Supreme Court's intervening cases have undercut *Beaumont*'s endorsement of *any* corporate-contribution ban—whether the utility-specific one here

or even a content-neutral ban. The plaintiffs therefore preserve for further review the argument that *Beaumont* should be overruled in its entirety.

Even applying *Beaumont*'s reasoning on its own terms, however, section 30a violates the First Amendment by eliminating the PAC and SSF options and almost any other avenue for utilities, or those aligned with them, to exercise the rights to political expression and association that come with supporting a candidate financially. Both employee PAC plaintiffs, for example, have long served as a way for DTE's and Consumers' respective employees and shareholders to express their political views collectively through campaign contributions. Exhibit 16, Mahoney Declaration ¶¶ 8–10, 15–20; Exhibit 17, Kipp Declaration ¶¶ 8–10, 15–19. Participation in the PACs is strictly voluntary, and it enables those individuals to aggregate their political speech and support candidates who share their perspective. Exhibit 16, Mahoney Declaration ¶¶ 8–10, 15–20; Exhibit 17, Kipp Declaration ¶¶ 8–10, 15–19. Often, the supported candidates do not share their perspective on *everything*—they might agree on land use but not rates, renewable energy but not data centers. But now, under section 30a, those employee PACs must cease those contributions entirely, because any organizations either "directly or indirectly established, financed, maintained, or controlled by" a utility or utility's "principal[s]" are barred from contributing to most candidates for state office or any party or political committees even loosely affiliated with those candidates. Mich. Comp. Laws § 169.230a(1), (2).

*Third,* section 30a is “a disproportionate measure” because “it imposes an outright ban on contributions, rather than a mere dollar limit on contribution amounts.” *Ball*, 245 F. Supp. 3d at 1014. Dollar limits are more likely to be appropriately tailored because they still permit campaign contributions while preventing a candidate from receiving large direct contributions that carry a higher risk of corruption or becoming disproportionately reliant on a few significant contributors. *See Buckley*, 424 U.S. at 26–27. An outright ban, by contrast, prohibits “even symbolic expressions of support through a small contribution,” *Deon*, 960 F.3d at 161, and is rarely tailored appropriately to the governmental interest in preventing *quid pro quo* corruption, *see McCutcheon*, 572 U.S. at 220–21; *Deon*, 960 F.3d at 161–64; *Lavin*, 689 F.3d at 548; *Ball*, 245 F. Supp. 3d at 1014. And as in other cases striking down industry-specific contribution bans, the MMOP initiative’s sponsors have never explained “why a flat prohibition is proportionate to the government’s interest in avoiding the risk of actual or perceived corruption that arises when donors from the [utility] industry make monetary contributions to political campaigns.” *Ball*, 245 F. Supp. 3d at 1014.

The Sixth Circuit reached the same conclusion in *Lavin* when striking down Ohio’s ban on campaign contributions by Medicaid providers. 689 F.3d at 548. In holding that the industry-wide ban was “vastly more restrictive than necessary to achieve its stated goal,” the Sixth Circuit explained that the state could easily have taken a “less restrictive approach,” such as directing the prohibition toward specific bad actors or “limiting campaign contributions from Medicaid providers rather than

banning them." *Id.* And while the First Amendment afforded legislators "some latitude" in crafting those restrictions, the court could not "stand by while the patient [was] euthanized." *Id.* Having "euthanized" the utility industry's contribution rights in the same way, section 30a's categorical prohibition must be struck down as unconstitutional. *Id.*

*Fourth,* section 30a cannot be reconciled with *McCutcheon* or *NRSC* in banning contributions to state and local party committees, committees "that make[] contributions to a candidate for office," and many other politically active entities that are deemed "affiliated" with a candidate. Mich. Comp. Laws § 169.230a(1), (3). In both *McCutcheon* and *NRSC*, the Supreme Court stressed that donations to third-party committees do not carry much risk of *quid pro quo* corruption because the "money flows through independent actors to a candidate," rather than "to a candidate directly." *NRSC*, 609 U.S. at 924 (quoting *McCutcheon*, 572 U.S. at 210). Those independent actors, the Court explained, are "legally and practically free to use the funds as [they] see[] fit" and "need not spend the money on the candidate of the donor's choice." *Id.*; *accord McCutcheon*, 572 U.S. at 210–11. So any "credit" for the contribution "must be shared among the various actors along the way." *McCutcheon*, 572 U.S. at 210–11. That elongated attribution chain, in turn, minimizes "the risk of *quid pro quo* corruption," which "is generally applicable only to the narrow category of money gifts that are directed, in some manner, to a candidate or officeholder." *Id.* at 211. And because disclosure and earmarking rules can adequately address any anti-circumvention concerns, those concerns cannot support an outright ban on

contributions to or expenditures by those independent actors. *See NRSC*, 609 U.S. at 923–31; *McCutcheon*, 572 U.S. at 211–12, 225–26.

All of that is true here. Whether from utilities, their affiliated organizations, or their "principals," contributions to committees and other third-party organizations are not made directly to candidates. Instead, those contributions pass through "independent actors," who are "legally and practically free to use the funds as [they] see[] fit." *NRSC*, 609 U.S. at 924. Even "if the funds are subsequently re-routed to a particular candidate," the third parties' independent decision-making minimizes any risk of *quid pro quo* corruption between the original contributor and the candidate. *McCutcheon*, 572 U.S. at 211. Section 30a's ban on those contributions therefore cannot be justified as "necessary" or "narrowly tailored" to preventing corruption. *NRSC*, 609 U.S. at 920; *see Free & Fair Election Fund v. Missouri Ethics Comm'n*, 903 F.3d 759, 763–66 (8th Cir. 2018) (enjoining enforcement of a PAC-to-PAC contribution ban enacted by ballot initiative).

The Supreme Court's reasoning carries even greater force for section 30a than it did in *NRSC* or *McCutcheon*, because section 30a extends its ban to people and entities that are several times removed from utilities or candidates. Section 30a, for instance, prohibits any utility-affiliated entities from contributing to any candidate-affiliated entities, while defining "affiliated" as expansively as possible. Mich. Comp. Laws § 169.230a(1)–(3). Section 30a thus uses "affiliated" as a proxy for "coordinated," even though the former is far looser than the latter, and even though most—and perhaps all—bans on coordinated expenditures cannot survive *NRSC*. By

enveloping so many entities, even those "indirectly" affiliated with either the contributor or the candidate, section 30a is the opposite of narrowly tailored.

*Fifth,* section 30a's ban on contributions is so disproportionate that it imposes *retroactive* liability on a contributor if a receiving entity later decides to make "electioneering communications" or "expenditures" that bring the entity within section 30a's scope. Mich. Comp. Laws § 169.230a(1)(e), (3). To do so, section 30a broadly defines the entities that are "affiliated" with a candidate. Mich. Comp. Laws § 169.230a(3). Then, it sets its contribution-ban trigger on whether those entities make "expenditures" or "electioneering communications" related to a candidate, including any public communications that merely "reference[] a clearly identifiable candidate" during a lengthy preelection blackout period. Mich. Comp. Laws §§ 169.230a(1)–(3), 169.205(4), 169.206. A utility-affiliated contributor thus faces liability under section 30a if a receiving entity decides to *mention* a covered candidate in its public communications long after a contribution is made. And unlike section 30b, section 30a contains no safe-harbor provision or scienter requirement that would protect a contributor from retroactive liability. *Compare* Mich. Comp. Laws § 169.230a(4) *with* Mich. Comp. Laws § 169.230b(7)–(8).

That prospect of retroactive liability, and the chilling effect that it imposes on the utility industry's First Amendment rights, cannot be viewed as narrowly tailored. As the Supreme Court has stressed, contributors do not have any control over third parties' decisions to spend money on particular candidates or advocacy, so there is little risk of *quid pro quo* corruption from those independent actors' decisions.

*McCutcheon*, 572 U.S. at 210–11. Section 30a's broad imposition of retroactive liability thus has no connection to the only permissible governmental interest here. *See id.* It serves only to deter the utilities and their allies from donating to any candidate-adjacent entities that might, possibly, decide in the future to "reference[]" a candidate publicly, even when engaged in issue advocacy. In taking that approach, section 30a embraces the type of wide-ranging, multiple-degree prophylaxes that the Supreme Court has condemned. *NRSC*, 609 U.S. at 930–31; *see also Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 476–83 (2007) (holding that a similar restriction on "electioneering communications" violates the First Amendment, even when it does not impose derivative liability).

*Sixth,* section 30a's poor fit is confirmed by the alternatives it ignores, many of which are already part of Michigan's campaign-finance framework. Michigan already has, or could use, tools that are far more targeted than section 30a: contribution limits, disclosure provisions, anti-conduit and attribution rules, anti-earmarking rules, and MPSC ethics rules. *See* Mich. Comp. Laws §§ 169.231, 169.241, 169.244(1), 169.270, 169.271, 460.1, 15.341, 15.342. *NRSC* underscores why those tools matter: disclosure, especially in the internet era, provides robust protection against corruption, and base contribution limits, earmarking rules, and disclosure requirements together serve anti-circumvention interests. 609 U.S. at 923–31.

The MMOP initiative's sponsors have never explained why those protections and "broadly applicable contribution limits are insufficient to prevent the risk of corruption in the [utility] industry, much less why an outright ban on contributions

from industry members is appropriate." *Ball*, 245 F. Supp. 3d at 1014; *accord Lavin*, 689 F.3d at 548. Nor do they offer any "support for their claim that [utilities] in fact pose a greater risk of corruption than other potential donors, including those subject to similar regulation and licensure requirements." *Ball*, 245 F. Supp. 3d at 1014. Instead, the initiative's proponents have simply heaped additional prophylaxes on utilities, enacting draconian restrictions far beyond Michigan's generally applicable campaign-finance laws. As in other contexts, that "prophylaxis-upon-prophylaxis approach" is a "significant indicator" that section 30a's restrictions "may not be necessary for the interest [they] seek[] to protect." *Cruz*, 596 U.S. at 306–07. And as in other contexts, those additional prophylaxes "impose[] a severe and direct restriction on free speech and infringe[] fundamental First Amendment values." *NRSC*, 609 U.S. at 930. Given that mismatch between section 30a's minimal added benefits and significant added costs, "[t]here is no avoiding the conclusion that the contribution ban set forth in [section 30a] is not closely drawn." *Lavin*, 689 F.3d at 548.

*Seventh*, and finally, other states' absence of similar laws confirms that section 30a is not narrowly tailored. As when evaluating the asserted governmental interest, the Supreme Court "often look[s] to the experience of the states" in assessing whether a restriction is sufficiently tailored. *NRSC*, 609 U.S. at 929 (citing *McCutcheon*, 572 U.S. at 209–10 & n.7, and *Cruz*, 596 U.S. at 307). And as in other cases striking down similar industry-specific bans, "bans with the scope and breadth of [section 30a] are not common among the[] states." *Deon*, 960 F.3d at 163. The plaintiffs are not aware

of any other state that restricts campaign contributions from its utility industry with anything close to section 30a's sweep. It is a unique-in-the-nation ban. Even states that have suffered corruption scandals in the utility industry, such as Ohio, do not have utility-specific bans on campaign contributions, much less bans with section 30a's breadth and scope. Thus, as in other cases, "[t]hat record" from other states "weakens any claim that [section 30a's] limits are a proportionate, necessary, and narrowly tailored means for addressing" any risk of *quid pro quo* corruption. *NRSC*, 609 U.S. at 930.

### B. The other preliminary-injunction factors, though secondary in this context, likewise support enjoining section 30a.

Because the plaintiffs are likely to succeed on the merits of their First Amendment claim, the preliminary-injunction factors favor relief. "In First Amendment cases, the plaintiffs' likelihood of success is usually determinative of their entitlement to injunctive relief." *Cath. Charities*, 162 F.4th at 696. But even so, the remaining preliminary-injunction factors support enjoining section 30a too.

Once section 30a takes effect, the plaintiffs will be forced to either forgo protected political activity or risk severe penalties. That is irreparable harm, because "the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).

The balance of harms also favors an injunction. The plaintiffs face the immediate loss of core political speech and associational rights. By contrast, the government has no legitimate interest in enforcing an unconstitutional speech

restriction. Nor will an injunction leave Michigan without campaign-finance protections. Existing contribution limits, disclosure requirements, anti-conduit rules, anti-earmarking rules, and ordinary enforcement mechanisms will remain in place. An injunction will merely preserve the status quo while the Court decides whether section 30a's utility-specific prohibition can stand.

The public interest points the same way. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). That principle carries special force here because section 30a burdens political speech about candidates, public officials, and matters of public concern. The public has an interest in hearing from all sides on those matters—not just the speakers trying to unbalance the debate.

## Conclusion

Section 30a of the MMOP initiative should be preliminarily enjoined.

MILLER JOHNSON
Counsel for Plaintiffs

Dated: November 5, 2026

By /s/ Stephen J. van Stempvoort
Stephen J. van Stempvoort
Andrew C. Goetz
Amanda L. Rauh-Bieri
45 Ottawa Avenue SW, Suite 1100
Grand Rapids, Michigan 49503
(616) 831-1700
vanstempvoorts@millerjohnson.com
goetza@millerjohnson.com
rauhbieria@millerjohnson.com

**Certification**

As required by Western District of Michigan Local Rule 7.2(b), the plaintiffs certify that this brief, filed in support of the plaintiffs' motion for a preliminary injunction, contains 10,464 words, excluding the parts of the brief exempted under Local Rule 7.2(b)(i). This word count was generated by the word-processing program used to create the brief, Microsoft Word for Microsoft 365.

By /s/ Stephen J. van Stempvoort